376 A.2d 648

**In re CUSTODY OF Mickey Frances HERNANDEZ.**

**Appeal of Miguel GARCIA and Frances Garcia, his wife.**

Superior Court of Pennsylvania.

Argued April 12, 1977.

Decided June 29, 1977.

Michael J. Bresnahan, State College, for appellant.

Thomas F. Morgan, Clearfield, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE and SPAETH, JJ.

SPAETH, Judge: .

This is a child custody case. The question is whether Mickey Frances Hernandez, now 4½ years old, should be awarded to her mother, Frances Hernandez (Garcia) and her husband, Miguel Garcia, or to Robert and Twila Peterson, with whom Mickey has been living since March 1973. The case arises on the Garcias' petition for habeas corpus, filed in September 1974. The lower court denied the petition, and awarded custody of Mickey to the Petersons. This appeal followed.

I

Before examining the facts of any case, one should be clear in one's mind about the legal principle that will guide the examination, and thus control the decision. Here, in defining that principle the pertinent cases have used various expressions, which may not always seem consistent. Some preliminary review is therefore required.

Generally speaking, child custody cases may be divided into three classes. The first class comprises those cases in

which the dispute is between the parents of the child; the second class, those in which the dispute is between the parents, or a parent, of the child and a third party; and the third, those in which the dispute is between the parents, or a parent, of the child and the state. Each class of cases must be decided by a different legal principle.

The present case, it will be observed, is within the second class. In order to determine the legal principle that controls the decision of such a case, it will be convenient to examine first the class of cases in which the dispute is between the parents, or a parent, and the state, and then the class of cases in which the dispute is between the parents themselves.

## A

■ When the dispute is between the parents, or a parent, and the state, the Juvenile Act [1] controls. Typically, the proceedings will be initiated by a social welfare agency filing a petition under the Act, asking the court to declare the child "deprived", and to order the child separated from its parents. In its opening provisions, the Juvenile Act provides that its fundamental purpose is "[t]o preserve the unity of the family whenever possible . . ." 11 Pa.C.S. § 50–101(b)(1), and a child who has been adjudicated "deprived" may be separated from its parents only upon a showing of "clear necessity." *In re: Clouse*, 244 Pa.Super. 404, 368 A.2d 780 (1976) (discussing proceedings under Juvenile Act and meaning of "clear necessity"); *In re: LaRue*, 244 Pa.Super. 218, 366 A.2d 1271 (1976); *Stapleton v. Dauphin County Child Care Service*, 228 Pa.Super. 371, 324 A.2d 562 (1974); *Rinker Appeal*, 180 Pa.Super. 143, 117 A.2d 780 (1955). *And see In re: Adoption of R. I.*, 468 Pa. 287, 361 A.2d 294 (1976). Thus the situations in which the state may intervene are limited, and its burden is very heavy. These restrictions derive from the convictions that the family is one of our most important institutions, that a child's best

1. Act of Dec. 6, 1972, P.L. 1464, No. 333, 11 Pa.C.S. § 50–101 *et seq.* (Supp. 1976).

interest is served by being raised within the family, and that the state should not unnecessarily intrude upon, and thereby weaken, the family.

■ At the opposite extreme, as regards rigor of proof, is that class of cases in which the dispute is between the parents of the child. Here, too, a controlling statute provides the standard to be applied: the court is to "remand such child [either to the father or to the mother] . . ., regard first being had to the fitness of such parent and the best interest and permanent welfare of said child." Act of June 26, 1895, P.L. 316, § 2, 48 P.S. § 92. *See Commonwealth ex rel. Parikh v. Parikh*, 449 Pa. 105, 296 A.2d 625 (1972); *Augustine v. Augustine*, 228 Pa.Super. 312, 324 A.2d 477 (1974); *Williams v. Williams*, 223 Pa.Super. 29, 296 A.2d 870 (1972); *Commonwealth ex rel. Gifford v. Miller*, 213 Pa.Super. 269, 248 A.2d 63 (1968). The concern in such cases is entirely with the child's physical, intellectual, moral, and spiritual well-being. *Commonwealth ex rel. Holschuh v. Holland-Moritz*, 448 Pa. 437, 292 A.2d 380 (1972). The burden of proof is shared equally by the contesting parents; thus, the hearing judge awards custody according to what the preponderance of the evidence shows.[2] By virtue of

**2.** This was not always so. It used to be that the basis of the father's right to custody was defined differently than was the basis of the mother's right, and that the mother's right was the stronger.

The father's right was explained as follows: "one [reason for the right] is, that he who brings a child, a helpless being, into life, ought to take care of that child until it is able to take care of itself; and because of this obligation to take care of and support this helpless being arises a reciprocal right to the custody and care of the offspring whom he must support; and the other reason is, that it is a law of nature that the affection which springs from such a relation as that is stronger and more potent than any which springs from any other human relation." *Commonwealth ex rel. Children's Aid Soc. v. Gard*, 362 Pa. 85, 94–95, 66 A.2d 300, 305 (1949) (quoting *Chapsky v. Wood*, 26 Kan. 650, 40 Am.Rep. 321 (1881)).

Thus it may be said that the father's right to custody of his child was seen as deriving from his position as father, and as continuing as a reciprocal of his obligation of support. *See Commonwealth ex rel. Thompson v. Altieri*, 184 Pa.Super. 431, 135 A.2d 811 (1957); *Commonwealth ex rel. Shamenek v. Allen*, 179 Pa.Super. 169, 116 A.2d 336 (1955). The basis of the mother's right was explained by reference only to the fact that she had borne the child; however, this fact

each having joined in creating the child, each parent is regarded as having an equal interest in the child's welfare. The state functions as arbiter, in the person of the hearing judge, rather than as interested participant.

It is now in order to consider the third class of cases, within which the present case falls. Typically, such a case will arise where a parent has given his or her child to a third party, who later, for one reason or another, refuses the parent's request to return the child. Unlike the other cases that have been discussed, the resolution of such a dispute is not controlled by statute. It is therefore necessary to reason from precedent and by analogy. When this is done, it will be observed that the case lies between those described above. It is not a situation where the state has felt compelled to intrude to protect the child. Nor is it a situation where because of their inherent characteristics both parties (the parents) have an equal interest in the child's welfare. It rather is a case that involves one party (the parent) who because of inherent characteristics has a special interest in the child's welfare, and another party, not like the state, a total stranger to the child, nor like the parent, inherently related to the child, but, nevertheless, one who has by reason

was regarded as sufficient to create a presumption that she should have the child if it was of tender years. *See Commonwealth ex rel. Logue v. Logue*, 194 Pa.Super. 210, 166 A.2d 60 (1960).

Since these decisions, the role of women in our society has changed, and a mother now shares equally with the father the obligation of support. *See Conway v. Dana*, 456 Pa. 536, 318 A.2d 324 (1976); *Commonwealth ex rel. Buonocone v. Buonocone*, 235 Pa.Super. 66, 340 A.2d 579 (1975). Thus it may be said that the basis of the father's right to custody and the basis of the mother's right are the same: each has a biological relationship to the child; and each has the obligation to support the child. With these changes, the "tender years presumption" has been reduced to the point where its only purpose now is to tip the scale to the mother's side if the evidence is equal, *i.e.*, if the best interest of the child "would be equally served by granting custody to either litigant". *Commonwealth ex rel. Grillo v. Shuster*, 226 Pa.Super. 229, 236, 312 A.2d 58, 62 (1973). Recently, moreover, a plurality of our Supreme Court has indicated that given the enactment of the Equal Rights Amendment to the Pennsylvania Constitution, Pa.Const., art. I (1974), the "tender years presumption" no longer exists even to this extent. *See Commonwealth ex rel. Spriggs v. Carson*, 470 Pa. 290, 368 A.2d 635 (1977).

of having cared for the child developed a special relationship with the child.

Although, as mentioned, there is no statute that controls how a custody dispute between a parent and such a third party is to be resolved, there is a statute that controls how another sort of dispute between a parent and a third party is to be resolved. It is the Adoption Act.[3] This Act provides for the involuntary termination of parental rights, but only where:

(1) The parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child, or has refused or failed to perform parental duties; or

(2) The repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent; or

(3) The parent is the presumptive but not the natural father of the child.

1 P.S. § 311.

These provisions, it will be observed, impose on the third party a burden comparable in weight with the burden imposed on the state by the Juvenile Act, *supra*. Thus, for example, under § 311(1), *supra*, there must be a showing that the parent intended to give up the child absolutely and has not in at least six months acted in a manner inconsistent with this "settled purpose." *Sarver Adoption Case*, 444 Pa. 507, 281 A.2d 890 (1971). Further, just as under the Juvenile Act the question of the child's welfare—of what is in the child's best interest—is not even reached unless, and until, there has been a finding of "deprivation," *In re: Clouse, supra; In re: LaRue, supra*, so under the Adoption Act it is not reached unless, and until, there has been a finding of "abandonment." *See Adoption of R. I.*, 468 Pa.

3. Act of July 24, 1970, P.L. 620, No. 208, art. I, § 101, 1 P.S. 101 *et seq.*

287, 361 A.2d 294 (1976); *Schwab Adoption Case*, 355 Pa. 534, 50 A.2d 504 (1947); *In re: McAhren's Adoption*, 460 Pa. 63, 331 A.2d 419 (1975).

■ These similarities between, on the one hand, an adoption case, and on the other, a custody case in which the state is a party, might seem to suggest that in a case like the present one the burden of proof on the third party should be the same as in an adoption case. The argument might be, that while it is true that the third party is not a stranger to the child to the same degree as is the state, nevertheless, the third party's relationship to the child is likely to be very comparable to the third party's relationship to the child in an adoption case. Further reflection, however, will persuade one to the view that despite this likely fact, the burden on the third party should be less heavy in a custody case than in an adoption case. This conclusion follows from the differing natures of an adoption order and a custody order. An adoption order is by nature final; a custody order is by nature always subject to modification upon a showing of changed circumstances. *Commonwealth ex rel. McGovern v. McGovern*, 225 Pa.Super. 281, 301 A.2d 905 (1973); *Commonwealth ex rel. Hickey v. Hickey*, 216 Pa.Super. 332, 264 A.2d 420 (1970). Given this changeable nature of a custody order, the burden on a third party seeking custody of a child should not be so heavy as when the third party seeks to adopt the child.

So much is clear, partly from the cases, and partly as a matter of reasoning. When we go beyond this general conclusion, however, matters become a good deal less clear.

### B

The lack of clarity just referred to occurs because the cases have used various, and it would seem inconsistent, expressions in describing the burden of proof that the third party bears. Sometimes it has been said that the parents have a "primary right" to custody of the child, although the right is not absolute and must yield to the child's best interest. *Commonwealth ex rel. Bradley v. Bradley*, 188

Pa.Super. 108, 146 A.2d 147 (1958); *Commonwealth ex rel. Galloway v. Galloway*, 188 Pa.Super. 313, 146 A.2d 383 (1958); *Commonwealth ex rel. Kraus v. Kraus*, 185 Pa.Super. 167, 138 A.2d 225 (1958); *Commonwealth ex rel. Shroad v. Smith*, 180 Pa.Super. 445, 119 A.2d 620 (1956). Other times it has been said that absent "compelling reasons" to the contrary, it will be "presumed" that the child's best interest will be served by being raised by its parents. *Commonwealth ex rel. Bendrick v. White*, 403 Pa. 55, 169 A.2d 69 (1961); *Auman v. Eash*, 228 Pa.Super. 242, 323 A.2d 94 (1974); *Commonwealth ex rel. Gifford v. Miller*, 213 Pa.Super. 269, 248 A.2d 63 (1968); *Commonwealth ex rel. Galloway v. Galloway, supra*. Still other times it has been said that the parents have a "prima facie right to custody," which "may be forfeited if convincing reasons appear that the best interests of the child will be served by awarding custody to someone else." *Commonwealth ex rel. Kraus v. Kraus, supra*, 185 Pa.Super. at 170, 138 A.2d at 226–227; *Commonwealth ex rel. Thompson v. Altieri*, 184 Pa.Super. 431, 135 A.2d 811 (1957); *Commonwealth ex rel. Shamenek v. Allen*, 179 Pa.Super. 169, 116 A.2d 336 (1955).

The first of these formulations is unfortunate, partly, perhaps, because the expression "primary right" connotes a property interest, as though a child were a chattel, *cf. Commonwealth ex rel. Children's Aid Society v. Gard, supra*; *Stapleton v. Dauphin County Child Care Service, supra*; *Commonwealth ex rel. Bankert v. Children's Services*, 224 Pa.Super. 556, 307 A.2d 411 (1973), but particularly because there is no explanation of what type of evidence will cause the primary right to become less than "absolute", and to "yield."

■ The second formulation is also unfortunate, for it is stated as a "presumption." Although "[a] presumption itself contributes no evidence, and has no probative quality. It is sometimes said that the presumption will tip the scale when the evidence is balanced. But, in truth, nothing tips the scale but evidence, and a presumption—being a legal rule or a legal conclusion—is not evidence. . . ." *Allison v.*

*Snelling & Snelling, Inc.,* 425 Pa. 519, 525, 229 A.2d 861, 864 (1967), quoting *Watkins v. Prudential Ins. Co.,* 315 Pa. 497, 173 A. 644 (1934). In deciding a child custody case, one should avoid the use of a "presumption", which tends to focus the analysis on the respective rights of the parties rather than on close scrutiny of all of the particular facts relevant to determining what will serve the child's best interest. *See Commonwealth ex rel. Grillo v. Shuster, supra*; *Auman v. Eash,* 228 Pa.Super. 242, 248, 323 A.2d 94, 97 (Dissenting Opinion).

The second formulation is further unfortunate in its requirement of a showing of "compelling reasons". This requirement might appear synonymous with the "clear necessity" requirement of the Juvenile Act, in a case in which the state is a party. If one is "compelled" to do something, it might be said that it is "necessary" to do it. As has been discussed, however, the burden of proof on a third party should not be as heavy as that placed upon the state; the definitions, or descriptions, of the respective burdens should therefore plainly differ.

The third formulation is both more accurate and clearer than either the first or the second. This formulation, it will be recalled, is that the parents' "prima facie right to custody" may be forfeited if "convincing reasons appear that the child's best interest will be served by awarding custody to some one else." To say that a parent has a "prima facie right to custody" properly allocates the burden of proof to the third party who is opposing the parent. The requirement of "convincing" (rather than "compelling") reasons makes it clear that the third party's burden is in weight midway between the state's burden ("clear necessity") and the one parent's burden in a case where the dispute is with the other parent (preponderance of the evidence). Finally, under the third formulation, whatever may be the "reasons" presented by the third party in the effort to overcome the parent's prima facie right, they must relate to the child's "best interest," and not merely to some characteristic of the parent that the third party or the hearing judge may regard unfavorably.

Given these considerations, it is the third formulation that we shall apply in examining the facts of the present case. While it would be too strong to say that cases enunciating other formulations are disapproved—for that would be to interpret those cases in a manner quite possibly not anticipated when they were decided—still, such cases should be read in the light of what has been said here.

One further point remains to be made; it concerns the manner in which the hearing judge is to conduct the inquiry when the dispute is between the parent and a third party.

 When the judge is hearing a dispute between the parents themselves, the manner of inquiry is structurally relatively simple. The judge has one question to decide: What is in the child's best interest? After hearing all evidence relevant to best interest, the judge must award custody according to whether the evidentiary scale tips to the mother's side, or to the father's.[4] When the judge is hearing a dispute between the parents, or a parent, and a third party, the manner of inquiry is more complex. The question still is, What is in the child's best interest? However, the parties do not start out even; the parents have a "prima facie right to custody," which will be forfeited only if "convincing reasons" appear that the child's best interest will be served by an award to the third party. Thus, even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the parents' side. What the judge must do, therefore, is first, hear all evidence relevant to the child's best interest, and then, decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, and down on the third party's side.[5]

4. See footnote 2, *supra*, in re possible impact of the tender years presumption.

5. When the case is one in which the dispute is between the parents, or a parent, and the state, or when it is an adoption case, the manner of inquiry is still more complex. There, as has been indicated *supra*, at pages 651–652, the hearing judge makes no inquiry regarding what is in the child's best interest until, and unless, he has made a finding of "deprivation" or "abandonment", as the case may be.

█ It is, of course, true that there are two distinct categories of "third parties": relatives, and non-relatives. However, to draw a distinction in the burden of proof allocated to one category as compared with that allocated to the other would be to indulge in over-refinement, which would distract the inquiry from the essential concern of the case—the child's best interest.[6] In this regard, it may be noted that formerly grandparents might be held responsible for the support of their grandchildren, but the statute was amended to eliminate this responsibility. The Act of June 24, 1937, P.L. 2045, § 3; as amended by the act of May 23, 1945, P.L. 864, § 1, 62 P.S. § 1973. With this loss of responsibility went the loss of a superior right to custody of grandchildren. *See Commonwealth ex rel. Bradley v. Bradley,* 188 Pa.Super. 108, 146 A.2d 147 (1958). This is not to discount the fact of blood relationship altogether; it may undoubtedly create a bond between the adult and child. However, except when the relationship is that of parent and child, how close a bond is a question better left to the hearing judge. Suppose that the third party who seeks custody in preference to the child's mother is a relative who has never had any contact with the child. Next suppose that the third party is a non-relative with whom the child has been living for several years, and that a strong and wholesome relationship has developed between the third party and the child. Comparison of these cases will show that the mere fact of relatedness is not a sufficient reason to impose a lesser burden on the third party relative than on the third party non-relative. Both relative and non-relative should be required to show "convincing reasons" why the mother (in the cases supposed) should not have custody of her child.

**6.** Thus, should the burden vary according to the degree of relatedness? Genetically speaking, degrees of relatedness may be stated mathematically. An identical twin is related to oneself as 1 to 1. The relatedness between parent and child is $1/2$; brothers and sisters, $1/2$; uncles and aunts, nephews and nieces, grandparents and grandchildren, half brothers and half sisters, $1/4$; first cousins, $1/8$; second cousins, $1/32$; third cousins, $1/128$. *See* R. Dawkins, *The Selfish Gene* 98–100 (1976).

## II

It is now possible to examine the facts of this case. It will be convenient first to state the facts in a general manner only, and after that to consider the specific issues of fact on which decision depends.

### A

Mickey's mother, Frances, was born in Cuba in 1957. In 1965 she moved with her family to Florida. In 1966 she went to Clearfield County, Pennsylvania, to live with Robert and Twila Peterson. Approximately a year later she returned to Florida to live with her father (her parents had been divorced).

In 1969 Frances met Miguel Garcia, who, she testified to the hearing judge, is Mickey's father. Mickey was born December 13, 1972; by that time Frances and Miguel were no longer dating. Frances and Mickey lived with Frances's father for a while but then moved in with Frances's widowed sister, Wanna, so that Wanna could care for Mickey while Frances went to work. However, Frances found that as a 15 year old girl she was unable to make enough money to support herself and Mickey. It was suggested to her, through a church organization, that she send Mickey to stay with the Petersons. The arrangements were made, and in March 1973 Mickey went to Clearfield County to live with the Petersons. That summer Frances entered Pentland Hall, an institution for girls run by the Division of Youth Services of the Florida Department of Health and Rehabilitation Services. While there she attended public school. In March 1974 she graduated from Pentland Hall, and in April 1974 she and Miguel Garcia were married.

Once married, Frances wrote the Petersons that she and Miguel wanted to have Mickey. When she received no response, Frances went to an attorney in Florida. Evidently he wrote the Petersons' attorney but without effect. Eventually she was referred by Legal Services of Greater Miami, Inc., to Keystone Legal Services, Inc., in State College, Pennsylvania.

In September 1974 the Garcias came to Clearfield County, and filed a petition for writ of habeas corpus. Hearings were held on October 18 and 22, 1974. At the close of the hearings the court stated that it would order investigations of both the Garcias' home and the Petersons' home. N.T. 191.

From this point on the record is incomplete. The Garcias' brief includes several appendices. Appendix A is a copy of a study made of the Garcias' home by the Division of Family Services in Miami. The report is dated February 21, 1975, and is addressed to the Director of the Clearfield County Child Welfare Services; it recites that it is sent "[a]s per your request, dated February 4, 1975." Appendix B is a copy of a letter from the court addressed to the attorney for the Garcias. The letter is dated March 27, 1975, and reads: "As requested, enclosed please find copies of the reports on the Garcia and Peterson homes. I will now accept briefs on this matter." Although these documents do not appear ever to have been made part of the record, at least in the formal sense, the Petersons' brief takes no issue with them.

Various further delays ensued. Appendices C through R of the Garcias' brief are copies of various documents (most of them letters); evidently these have been included in the brief by way of explaining the delays. However, as at least most of the documents are not of record, and are not agreed to, we have not considered them. Instead, we simply note that the delays were in no way attributable to the Garcias. On July 21, 1976, 21 months after the hearing, the lower court entered an order, accompanied by an opinion, dismissing the Garcias' petition for writ of habeas corpus and directing that Mickey remain with the Petersons. The ensuing appeal was argued to us in April 1977.

B

" 'Under both the statutory and case law, the scope of our review in child custody cases is quite broad and, while we cannot nullify the fact-finding function of the hearing judge, we are not bound by a finding which has no

competent evidence to support it.'" *Commonwealth ex rel. Grillo v. Shuster, supra,* 226 Pa.Super. at 235, 312 A.2d at 62, quoting *Commonwealth ex rel. Gifford v. Miller,* 213 Pa.Super. 269, 273–4, 248 A.2d 63, 66 (1968). Further we are not bound by inferences or deductions made by the hearing judge from the facts found. *Commonwealth ex rel. Bowser v. Bowser,* 224 Pa.Super. 1, 302 A.2d 450 (1973). To enable us to exercise this quite broad review, "the hearing judge should file in every custody case a comprehensive opinion reflecting a thorough analysis of the record as a whole and specifying the reasons for the ultimate decision." *Commonwealth ex rel. Grillo v. Shuster, supra* 226 Pa.Super. at 237, 312 A.2d at 63. *And see Commonwealth ex rel. Holschuh v. Holland-Moritz,* 448 Pa. 437, 292 A.2d 380 (1972); *Gunter v. Gunter,* 240 Pa.Super. 382, 361 A.2d 307 (1976).

Here, an examination of the lower court's opinion, in light of the testimony presented, persuades us that we must reverse. The opinion discloses that in evaluating the testimony, the court did not apply the correct legal principle. Moreover, when that principle is applied, one will discover no "convincing reasons" that overcome Frances's "prima facie right" to the custody of Mickey.

### 1

■ The lower court states the principle it applied in evaluating the testimony as follows:

As noted above, while natural parents may have a prima facie right to custody, nevertheless, if the best interests and welfare of the child require it, custody may be placed in a non-relative.

Opinion of Lower Court at 3.

This statement, it will be observed, is both incomplete and a confusion of different principles—which, given the cases, as they have been discussed above, is hardly surprising. It is at best incomplete, and at worst misleading, to say that "natural parents *may* have a prima facie right to custody." To put it this way considerably depreciates the parents' status. They *do* have a prima facie right. This depreciation

is confirmed by the court's failure to describe at all the sort of evidence that will result in the parents' prima facie right being forfeited. All that is said is that "custody may be placed" as the child's "best interests and welfare . . . require." This would be appropriate were the dispute between the parents themselves. However, where, as here, the dispute is between the parents, or a parent, and a third party, both completeness and correctness require acknowledgment that the parents' prima facie right will be forfeited only if "*convincing reasons* appear that the best interests of the child will be served by awarding custody to someone else."

### 2

Here, no convincing reasons appear why Frances's prima facie right to the custody of Mickey should be forfeited.

The lower court opens its opinion with an indication of the history of the case and the legal principles to be applied. It then states:

> In addition, the credibility of the witnesses must be determined, and in this respect, the Court states that the credibility of the Petitioners, and specifically the testimony of Frances Garcia, is viewed with suspicion. On several occasions throughout the record, specifically pages 47, 48 and 54, she admitted to being untruthful, and from her general appearance on the witness stand, her manner of testifying, and other considerations, the court determined that her statements were not to be accepted at full value.

Opinion of Lower Court at 2.

Given no further elaboration, we are unable to identify or appraise the "other considerations." It is, however, instructive to examine the cited admissions by Frances that she had been untruthful.

The admissions at N.T. 47 and 48 concern one "Johnny." In June, 1973, Frances wrote to Mrs. Peterson asking for the return of Mickey, and stating that "Johnny" would give her money to support Mickey. She testified that in addition, she had said to her mother and to Mrs. Peterson that Johnny

was Mickey's father. She admitted to the lower court that these statements were lies. She said that she had been dating Johnny but that he did not care anything about Mickey and had in fact broken up with her when he thought she was trying to pretend that he was Mickey's father. She explained that during her pregnancy she had lied to her mother because her mother did not know Miguel Garcia but knew Johnny, and that later she had lied to Mrs. Peterson "so that I could get the baby back." N.T. 47.

The admission at N.T. 54 was to her lawyer in Miami and concerned the amount of money that Miguel Garcia was making. Frances explained that she exaggerated the amount "because I figured if he thought we didn't make enough money [we would be denied custody]." N.T. 54.

It cannot be doubted that the fact that Frances had lied in the past was relevant both to her general credibility and to her moral character as a mother. However, as will more fully appear as the testimony is discussed, when she lied, Frances was a young woman—really, more a girl than a woman—struggling against very difficult odds to get back her child. Nothing in the lower court's opinion recognizes the poignance of her struggle, or the determination with which she has persisted in it.

Apart from the discussion of Frances's credibility, the opinion of the lower court barely exceeds two pages; so far as the facts of the case are concerned, the opinion consists of only two paragraphs. This in no respect complies with our requirement, which we have insisted upon, that there must be filed "a comprehensive opinion reflecting a thorough analysis of the record as a whole and specifying the reasons for the ultimate decision." *Commonwealth ex rel. Grillo v. Shuster, supra,* 226 Pa.Super. at 237, 312 A.2d at 63; *and see Gunter v. Gunter, supra.* In addition we are obliged to note that to the extent there is discussion of the facts, the discussion does not correspond with the record.

The lower court states that it

finds that Mrs. Garcia equivocates as to the actual paternity of this child, and although she now states that her

husband is the father, she has in the past stated otherwise. The husband of the Petitioner was not aware of the birth of the child for a considerable length of time.

Lower Court Opinion at 3.

It would seem from these statements that the court did not believe Frances's testimony that Miguel is Mickey's father, or her explanation of why she had pretended that Johnny was. It cannot be said, however, that Frances "equivocates" regarding Miguel being Mickey's father. While admitting past lies, she consistently maintained to the lower court that Miguel was Mickey's father. N.T. 13, 33, 72. At no point did she equivocate in the least. In addition, the court omits to comment on Miguel's testimony that he is Mickey's father, N.T. 89, and that he loves Mickey, and wants to care for her, N.T. 103.

As regards Miguel "not [becoming] aware of the birth of [Mickey] for a considerable time": Miguel testified that when he stopped dating Frances, "[s]he told me [she was pregnant], but I didn't believe her." N.T. 90. It will be recalled that Mickey was born in December 1972, and sent to Pennsylvania in March 1973, and that Frances was in Pentland Hall from the summer of 1973 until March 1974. Miguel testified that he learned of Mickey's birth from Frances's sister Wanna, N.T. 90, and while his testimony is not entirely clear just when this was—probably because Miguel was raised in Cuba and his native tongue is Spanish, N.T. 100—the court itself interjected during the questioning that "the time he learned the child was about six months old. Now, I think that's pretty definite, isn't it?" N.T. 94. Given all of the circumstances, this delay hardly seems sinister, or even surprising. Furthermore, even if Miguel's testimony that he is Mickey's father is put to one side, and the question of paternity considered unresolved this does not affect the fact that Miguel is married to Mickey's mother, and has manifested his love for and desire to raise Mickey. These would seem to be the important points in deciding whether any "convincing reasons" appear why Frances should not have custody of Mickey.

The lower court also stated that "Mrs. Garcia voluntarily gave the child away to the Petersons in March of 1973." Lower court opinion at 2. This hardly seems adequate. Frances's mother died the day after Mickey was born. N.T. 21. As has already been mentioned, Frances tried living with her sister Wanna, who took care of Mickey while Frances worked. She explained to the court why this had not proved successful:

. . . I was too young to work [she was 15] and I wouldn't make enough money to support her. So, I had talked to the welfare lady. But after that it was when Mrs. Peterson—you know, after that Mrs. Peterson came to get the baby.

Q. Did you prefer to have Mrs. Peterson look after your child for a temporary time rather than go on welfare?

A. Yes, I did. (N.T. 17)

Certainly no court should penalize a young mother for such conduct. *Cf. In re: Clouse, supra.*

The lower court states that "the record is not conclusive as to whether she [Frances] intended this to be a permanent situation . . .." Lower court opinion at 2. Again, this hardly seems adequate. Frances testified that *she* intended the situation to be temporary, and made her intent clear to Mrs. Peterson. N.T. 17, 21, 23. It is true that *Mrs. Peterson* testified that "I thought she was letting us have her, just to bring up and care for her like we did her." N.T. 179. This testimony, however, is contradicted by Mrs. Peterson's own letter to Frances (not mentioned by the lower court) dated July 10, 1973, in which Mrs. Peterson said: "I know how you feel when you said you never intended to give her away." Petitioners' Exhibit No. 2.

The lower court stated that Frances had maintained little contact with Mickey and the Petersons, and that Frances's "three or four letters" contained "only a line or two [that] was directed to inquiring as to the welfare of Mickey." Lower court opinion at 3. Regarding the number of her letters, only one is in evidence—produced by the Petersons. Respondents' Exhibit A. Frances testified that she wrote

five or six times, and also telephoned three times. N.T. 50–51. Also, she testified, "Every time I wrote [Mrs. Peterson], I told her that I wanted to get my baby back," but "I didn't get a response," and "that's why I had to go see a lawyer." N.T. 74. Also, she testified, when she did get a letter from the Petersons, "[a]ll it was was would you please sign the paper [permitting Mickey's adoption]." N.T. 74. Even if the lower court chose to disbelieve Frances's testimony, it is not clear how it could discredit her letter of June 18, 1973 (three months after relinquishing Mickey to the Petersons), which was admitted into evidence as the Petersons' Exhibit A. In it Frances wrote: ". . . she told me that you wanted to adopt the baby, I'm truely sorry but I don't want to give her up to any one. I hope you understand and will forgive me for puting you through all this trouble, but Michell [the Petersons' name for Mickey is Michelle] means a lot to me and I love her more than any thing. I know you love her to but you do understand I could never forgive myself if I gave her to anyone. . . . When you write will you tell me what would be best for me to do. Or I should go up there or bring her back down . . May God bless you and the family. Love, Francie." Mrs. Peterson wrote back on July 10, 1973, repeating her request for permission to adopt Mickey. Petitioner's Exhibit No. 2.

 ▮ The lower court also states that

. . . at no time, did she [Frances] or her husband recognize the child's birthday by card or gift, or any other holidays, such as Christmas or Easter. In addition, no support, either financial or in kind, has been offered by the Petitioners for Mickey.

Lower court opinion at 3.

Frances acknowledged that she never sent any card or gift to Mickey. N.T. 67. This hardly amounts to a "convincing reason" for denying her custody of Mickey, particularly in light of the evidence of her love for Mickey and of her tenacious struggle to regain her. As for Frances's and Miguel's failure to support Mickey: Mr. Peterson testified that he had never requested any support. N.T. 152. Mrs.

Peterson testified that neither had she ever requested any support. N.T. 182. Given this testimony, the failure to provide support cannot be regarded as indicative of an intent to abandon Mickey. *See Commonwealth ex rel. Thompson v. Altieri, supra.*

The foregoing has been concerned with one of the two paragraphs of factual discussion in the lower court's opinion. The other of the two paragraphs reads as follows:

> Also to be considered, and of primary importance, is the fact that this child has spent all but the first three (3) months of her life with the Respondents. The record indicates that she refers to the Respondents as her mother and father, and that she does not know either of the Petitioners herein, indicating that to return her to the Petitioners would uproot her from her present comfortable and familiar surroundings in which she is receiving the love and affection needed by a child of such an age from persons that she herself loves, and place her, in effect, with total strangers in an area completely unfamiliar to her. The character of the Respondents has not been questioned and the Court finds them to be of high character and perfectly suitable in all respects to care for Mickey. They not only have the ability personally, financially, and from the standpoint of being able to provide proper housing, but, in addition, they have the love and desire to proceed as they have in the past.

Lower Court Opinion at 2.

This statement may be accepted so far as it concerns the Petersons; however, it ignores three critical facts: Mickey has spent all but the first three months of her life with the Petersons, first, because of the Petersons' repeated refusals to return her; second, despite Frances's and Miguel's repeated efforts to secure custody of her; and third, because the lower court delayed its decision on Frances's and Miguel's petition from October 22, 1974, when the hearings closed, until July 21, 1976.

There can be no question that stability is important to a child's welfare, and that in deciding who should have

custody of the child it will therefore always be essential to consider how long the child has spent with the third party. *Commonwealth ex rel. Bankert v. Children's Services,* 224 Pa.Super. 556, 307 A.2d 411 (1973); *Commonwealth ex rel. Kraus v. Kraus, supra.* This consideration, however, must take into account all of the evidence, including the reasons why the child has been so long with the third party. It has repeatedly been held that the fact that a child has been away from a parent for a long time will not by itself defeat the parent's right to custody. *In re: Adoption of Farabelli,* 460 Pa. 423, 333 A.2d 846 (child had lived with grandparents from birth until age of eight); *Commonwealth ex rel. Johnson v. Pinder,* 217 Pa.Super. 180, 269 A.2d 511 (1970) (during child's nineteen months of life father in Illinois working and attending college and able to visit child only three times); *Commonwealth ex rel. Lovell v. Shaw,* 202 Pa.Super. 339, 195 A.2d 878 (1963) (five year old child with grandfather and step-grandmother since age of ten months).

To hold otherwise would be to enable the third party to defeat the child's parent by force—by keeping possession of the child, and by prolonging that possession by litigation. We have never permitted such tactics to succeed. *Commonwealth ex rel. Lovell v. Shaw, supra,* is in point. There, the mother was unable to find her child for some time because of misleading and untruthful statements by the child's father, who left the child with the Shaws, who were the child's grandfather and step-grandmother. The child's mother persisted in her efforts, however, and eventually did find her child. In reversing the lower court, and awarding custody to the mother, this court, by Montgomery, J., three judges dissenting, said:

> Viewing the situation from the side of the Shaws, we cannot say that the distress in this case is not due partly to their actions. Admittedly, they have cared well for Carolyn Sue since they received her from her father when she was ten to eleven months old. They have come to love her as their own. However, except for writing one letter to a lawyer who was supposed to represent the child's

mother, they made no other effort to find the appellant. On the other hand, they did take steps to secure an injunction to prevent the child's grandmother, or anyone else from taking the child from Pennsylvania; started proceedings to adopt Carolyn Sue; and then hired a detective to check on the appellant's living conditions. Why could they not have made an effort to locate the mother of a ten-month old infant when they, knowing the father to be irresponsible, took custody of the child? 202 Pa.Super. at 346, 195 A.2d at 881.

Also in point is *In re: Custody of Myers*, 242 Pa.Super. 225, 363 A.2d 1242 (1976). There the dispute was between a mother and a grandmother and step-grandfather. Emphasizing the interest of a parent, this court, by Price, J., reversed and awarded custody to the mother. Watkins, P. J., and Van der Voort, J., noted their dissent. Spaeth, J., filed a concurring opinion. Among other facts, there appeared the following: The grandmother and step-grandfather, the Brenners, had received the child, Tammy, on a temporary basis; the child's mother was working and having difficulty hiring baby sitters. Upon learning that the Brenners "were getting up a petition to have Tammy taken from me," the mother took Tammy back, but was tricked into returning her. Immediately after regaining Tammy, the Brenners filed their petition for custody. In the concurring opinion it is said:

It is evident that the Brenners disapprove of appellant: She has been on probation for forgery; she has had children by three men, two of whom have been sentenced to prison; she is on relief. So thinking, they have taken Tammy by trick, kept her by force, and apparently with some success, have tried to turn her against her mother. I hope we never sanction such conduct. Might does not make right, and no interpretation of "best interests" should ratify oppression, no matter the oppressor's explanation. *Cf. Commonwealth ex rel. Blank v. Rutledge*, 234 Pa.Super. 339, 339 A.2d 71 (1975). Appellant loves Tammy. While she had her she took good care of her. She should have her back.

242 Pa.Super. at 232, 363 A.2d at 1245.

Insofar as a parent's right to custody of her child is concerned, the present case is far stronger than either *Lovell* or *Myers*. In *Lovell*, after becoming separated from her child, the mother gave birth to an illegitimate child, and at the time of the hearing in the custody proceeding was keeping company with a married man. The difficulties of the mother in *Myers* have already been indicated by the foregoing quotation from the concurring opinion in that case. Here, Frances has been in no comparable difficulty; there is no basis for finding—and it is noteworthy that the lower court does not find—that she is in any respect an unfit mother or has engaged in any misconduct that would cause her to forfeit her prima facie right to custody of Mickey.

The Petersons' brief calls our attention to the fact that Frances has been in Pentland Hall. Appellees' Brief at 16. There can be no doubt that as a child, Frances did get into some trouble. She testified, however, this was only for truancy and running away. N.T. 61. This testimony, moreover, is confirmed by the report sent to the lower court by the Division of Family Services in Miami, where this is said:

> Mrs. Kathleen Mayer, a Youth Services Worker from Pentland Hall, worked quite closely with Frances from August 1973 until March 1974. She indicated that Frances was placed there after numerous acting-out and runaway behavior. Mrs. Mayer is of the opinion that Frances made a drastic improvement while living there and that she should get her child back. She sees no obstacles as far as Frances being a good and concerned mother toward Michelle. She indicated that Frances had never had major charges placed against her.

The Petersons' brief also suggests that the position of Frances and Miguel is "financially unstable," saying that "the record reveals the complete lack of financial security in [the Garcias'] home." Appellees' Brief at 17, 18. Financial discrepancies between the parents and a third party are not sufficient reason to deprive the parents of custody. *Commonwealth ex rel. Holschuh v. Holland-Moritz*, 448 Pa. 437,

292 A.2d 380 (1972); *Commonwealth ex rel. Gifford v. Miller*, 213 Pa.Super. 269, 248 A.2d 63 (1968); *Commonwealth ex rel. Lovell v. Shaw, supra* ; *Commonwealth ex rel. Kraus v. Kraus, supra.* In addition, however, the record does not support the assertions made in the Petersons' brief. Thus, in the report sent to the lower court by the Division of Family Services in Miami, it is said:

Frances is a nice looking girl of 17 years who was slightly nervous during the interview. She seems quite anxious and sincere in obtaining custody of her daughter. Her appearance and manner were appropriate for her age.

Miguel Garcia was more reticent but also verbalized his desire to have their daughter with them. He is 18 years and seemed quite mature for his age. The Garcias were married on April 18, 1974. At first, they lived with Frances' father but now live in one-bedroom apartment located at 1254 N.W. 6th St., Apartment # 8, Miami. The apartment, located in a new building, is quite large, with terrazzo floors throughout, this being the norm for Miami apartments. It contains a living-dining room, modern kitchen, bathroom and large bedroom. There is plenty of room to put a baby's bed if necessary, in the bedroom. Mrs. Garcia keeps the apartment in good order and has it decorated with family pictures. The rent is $185 per month.

Both Frances and Miguel Garcia are permanent residents of the United States and have been here for approximately 15 years. Frances has never finished school, but would like to get some vocational training as a laboratory technician. Miguel has one more year to finish high school, though he is not currently attending. He hopes to finish by attending night school.

Miguel is the sole support of the family at the present time. He works for the Talisman Sugar Corporation in Belle Glade, Florida. His salary is approximately $233 per week for working as a laborer. The work is steady, with periodic, one-week layoffs after the sugar cane harvest. These are not permanent layoffs, as he always goes back to work.

Frances Garcia had previously worked part-time in a restaurant, but is no longer employed. She does not want to be employed if Michelle is returned to her, as she wants to spend most of her time on child care. If and when Michelle enters pre-school, she will then think about working.

The family has no outstanding debts and they own a 1969 Dodge Charger, which is completely paid for. They have approximately $500 in their savings account, for use in case of emergency.

Both Frances and Miguel are in good health. Frances was previously involved in a car accident in 1974, at which time she was hospitalized. She has fully recovered since that time.

With regard to this report, it may be added that as a result of her car accident, Frances received money damages. It was from these that she and Miguel met the expenses of their two trips to Pennsylvania, the first to file their petition to be awarded custody of Mickey, and the second to participate in the hearings. N.T. 96–98.

### 3

One point remains to be discussed. At the end of its opinion the lower court states:

> Moreover, to award custody to the Petitioners herein would be permitting the child to leave the jurisdiction of this Court, and while this is not the controlling factor in this case, it must, nevertheless, be given some weight
>
> . . . ..

Lower court opinion at 4.

In support of this statement the court cites *Brown v. Brown,* 206 Pa.Super. 439, 213 A.2d 395 (1965).

*Brown* is not in point. First, there the lower court awarded custody of the children to their maternal grandparents. We reversed, and awarded them to their father. Thus the case is one of the many emphasizing a parent's prima facie right to custody. Second, while we did say that "[o]nly unusual circumstances will justify placing a child beyond the

jurisdiction of the court", *id.* at 444, 213 A.2d at 397, today very little weight can be placed on this statement. It was quoted by a majority of this court in *Commonwealth ex rel. Spriggs v. Carson,* 229 Pa.Super. 9, 18, 323 A.2d 273, 277 (1974) (Price, J., joined by Spaeth, J., dissenting). On appeal, the Supreme Court reversed and reinstated the order of the lower court, which had awarded custody of the child to the father, who lived in Florida. In reversing, Mr. Justice Nix, speaking for a plurality of the Court, said:

> In today's accessible and communicative world the validity of this proposition is open to serious question. It would be presumptive [*sic*: presumptuous?] to believe that the care and concern of the Pennsylvania Courts for the best interest and welfare of a child is not shared by our sister States.

470 Pa. at 299, 368 A.2d at 639.

*And see Davidyan v. Davidyan,* 230 Pa.Super. 599, 327 A.2d 145 (1974) (awarding child to mother in Scotland, and collecting cases).

### III

In Part I of this opinion it was determined that the controlling legal principle in this case was that Frances's "prima facie right to custody" of Mickey may not be forfeited unless "convincing reasons appear that [Mickey's] best interest will be served by awarding custody to [the Petersons]." In Part II, it was determined, first, that the lower court did not apply this legal principle, and second, that no such convincing reasons do appear. Given this state of the record, this court has a choice of procedures: either to remand for further proceedings, or to reverse and award custody of Mickey to Frances.

The better procedure is to reverse. Extensive delays have already been experienced. The still further delays consequent upon remand could only have unfortunate effects. If reasonably possible, these effects should be avoided. Here, that may be accomplished by outright reversal. This court has the power to make an independent

judgment, and to enter such order on the merits as justice requires. *Commonwealth ex rel. Ulmer v. Ulmer*, 231 Pa. Super. 144, 331 A.2d 665 (1974); *Commonwealth ex rel. Johnson v. Pinder, supra.*

While we will not exercise that power when the record is so incomplete as to lead to the conclusion that the case has been handled in a "summary fashion," *Gunter v. Gunter, supra*, 240 Pa.Super. at 402, 361 A.2d at 318, here the record is sufficiently complete and clear to enable us to judge where the merits lie.

The order of the lower court is reversed, and custody of Mickey is awarded to her mother, Frances Hernandez Garcia.

VAN der VOORT, J., did not participate in the consideration or decision of this case.

WATKINS, President Judge, concurs in the result.

PRICE, J., dissents.