**Hine v. Wells**

*Barbara H. Beringer,* for plaintiffs.
*Thad M. Gelsinger,* for defendants Wells.
Defendant Thrasher did not participate.

LASH, *J.,* January 14, 2010—The matter before this court is the custody action filed by plaintiff, Patricia Hine.

Trial was held on January 8, 2010. We enter the following findings of fact:

## I. FINDINGS OF FACT

(1) Plaintiff, Patricia Hine (Mother), is an adult individual who currently resides at 1111 Green Street, Second Floor, Reading, Berks County, Pennsylvania 19604.

(2) Defendants, Larry Wells and Stacey Wells, are adult individuals currently residing at 3 Summit Circle, Womelsdorf, Berks County, Pennsylvania 19567.

(3) The defendant, Quillen Thrasher (Father), is an adult individual whose last known address is 927 Mulberry Street, Reading, Berks County, Pennsylvania 19601.

(4) Mother and Father are the natural parents of a daughter, Jocelyn Hine, born September 12, 2005.

(5) Mother is also the parent of two other children, Nathanial DiGuardi, born September 10, 1999, and Jeremy Kiwak, born June 12, 2003. Nathanial resides with his paternal grandmother, pursuant to an order of this court entered June 2, 2009. That order also provides that Mother has partial custody of Nathaniel on alternate weekends from Friday at 5 p.m. to Sunday at 5 p.m. and one evening per week. The opinion and order of this court entered June 2, 2009 is incorporated by reference into this opinion. Jeremy resides with his father. Jeremy's father and mother have an informal agreement, permitting Mother to see Jeremy anytime she would like.

(6) The within custody matter is a dispute between Mother and the Wells for physical custody of the minor

child. The Wells have had physical custody of the minor child since July 31, 2007, initially, as foster parents through dependency proceedings, then through court order on the basis of in loco parentis. The Wells are distantly related to Father, who is the uncle of the Wells' grandson.

(7) Mother, Father, and the minor child resided together from the minor child's birth until July 31, 2007.

(8) On July 31, 2007, the Berks County Children & Youth Services (CYS) filed an emergency petition, alleging Father was considered a risk to the safety of the minor child, as well as Mother's other children.

(9) The petition stems from Father's conviction in Berks County court of endangering the welfare of a child and simple assault. Father was alleged to have committed "shaken baby syndrome" against a third-party child.

(10) CYS was informed of Father's conviction on July 30, 2007. On that date, CYS proceeded to Mother's home where they discovered that Father was residing with Mother and was present in the home and Mother was consuming alcohol while involved in the caretaking of her children. CYS then took custody of the children.

(11) On July 31, 2007, Mother's children were removed from her home. The subject minor child was placed with the Wells as kinship foster parents. The Wells complied with all regulations and requirements necessary to obtain the status of foster parents.

(12) After the minor child and Mother's other children were declared dependent, CYS made recommendations

to Mother, requesting her cooperation for the purpose of eventually having her children returned to her. CYS specifically requested that Mother cooperate with parenting education, drug/alcohol evaluations and any treatment recommendations, random urinalysis, mental health evaluations, treatment recommendations, case work services, and visitation with the children.

(13) Mother obtained a psychiatric evaluation by the staff psychiatrist at Berks Counseling Center. She was diagnosed with ADHD and bipolar disorder. She presently takes Prozac, Doxepin and Gobopetin for these conditions.

(14) Mother has participated in four separate parenting education programs, including "Baby College" at Reading Area Community College.

(15) Mother complied with CYS casework services, including receiving supervised visits with the minor child at various agencies.

(16) Mother participated in the BCCYS/Berks Community Action Program Time Limited Family Reunification Program, including parenting education and casework services, with a goal of returning the minor child to her.

(17) Mother submitted to random urinalysis when requested and has never tested positive.

(18) Additionally, prior to the children being declared dependent, Mother had participated through Berks Counseling Center in Maternal Intervention and Supportive services. She continues to participate with these services.

(19) On August 20, 2008, a dependency review hearing was held before the Honorable Scott D. Keller. This resulted in an order being entered, terminating the dependency of the minor child and awarding custody to the Wells.

(20) CYS had initially sought to have the minor child returned to Mother at the time of the review hearing and had filed a petition to that effect. However, CYS withdrew that petition after it determined that Mother was maintaining contact with Father.

(21) Following the hearing on August 20, 2008, a CYS caseworker advised Mother that because the agency would no longer be involved in the minor child's case, she would independently have to contact the Wells to make arrangements to see the minor child and should file a custody action if she wanted the minor child returned to her. Mother then filed the within action on November 12, 2008.

(22) From the time of the initial CYS hearing on July 31, 2007 until the present, Mother's contact with the minor child has been limited. For the most part, her visits have been supervised, initially with CYS at the courthouse. She also had visits at the Wells' house, then subsequently at the office of the minor child's counselor, Jean Scrincosky, based on the Wells' belief that the visits at the Wells' home were confusing to the minor child. After a period of time, Ms. Scrincosky declined to provide additional access for these visits, resulting in the visits eventually being scheduled through Catholic Charities, a non-profit agency, who provided supervised visits at no cost to Mother. Additionally, for a period of time during Mother's residence at a transitional housing

unit, Mother was permitted unsupervised visits on weekends.

(23) Shortly after the dependency review hearing on August 20, 2008, Mother began cohabiting with Father. This lasted for approximately two to three weeks, then Mother sought and obtained a protection from abuse order against Father. She has not had contact with Father since that time.

(24) Mother is currently unemployed and receives SSI benefits.

(25) Mother currently resides in the Reading School District.

(26) Defendant, Stacey Wells, is employed through Adecco Temp Services at the Berks County Prison in the Records Department, working full-time. Defendant, Larry wells, is unemployed but is attending school at Reading Area Community College. He is available to care for the minor child during the day.

(27) Defendant, Stacey Wells, has three other children, all adults, with the youngest, Dorothy Wells Millinger, also being the child of defendant, Larry Wells.

(28) The Wells reside in the Conrad Weiser School District.

## II. DISCUSSION

In making disposition, this court considered the testimony of Mother, defendant, Stacey Wells, Charlene Parker of Berks Counseling Center, who supervised the transitional housing where Mother resided for a period of time, and Connie Malafarina, a therapist from Berks

Counseling Center, as well as the exhibits of the parties.

At issue is primary physical custody. The paramount concern in a child custody proceeding is the best interests of the child. *Costello v. Costello,* 446 Pa. Super. 371, 375, 666 A.2d 1096, 1098 (1995). A determination of what is in the best interests of a child is made on a case-by-case basis and must be premised upon consideration of all factors which legitimately have an effect upon a child's physical, intellectual, moral and spiritual well-being. *Alfred v. Braxton,* 442 Pa. Super. 381, 385, 659 A.2d 1040, 1042 (1995). (citations omitted)

That being said, we also recognize the Wells' added burden as third parties. "[W]here the custody dispute is between a biological parent and a third party, the burden of proof is not evenly balanced. In such instances, 'the parents have a "prima facie right to custody," which will be forfeited only if "convincing reasons" appear that the child's best interests will be served by an award to the third party. Thus, even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the [biological] parents' side.'" *Jones v. Jones,* 884 A.2d 915, 917 (Pa. Super. 2005), quoting *In re Hernandez,* 249 Pa. Super. 274, 376 A.2d 648, 654 (1977). (emphasis omitted)

We initially note that the Wells have provided a good home for the minor child. Prior to CYS taking custody of the minor child through the dependency proceedings, the Wells had no relationship with the minor child, nor had any interest in becoming foster parents. However, when called upon, they opened their home to a minor child in immediate need and safeguarded her welfare for

the last two and one-half years. They continue to do so even after the court terminated the dependency, resulting in the loss of subsidy for the minor child's maintenance. They are willing to continue to provide a home for the minor child, as long as the minor child needs one. However, they recognize that the minor child should reside with her mother, once Mother is able to sufficiently care for the minor child. This court truly appreciates everything the Wells have done for the minor child.

The children, including the minor child, were initially taken from Mother's care for several reasons, the primary one being her relationship with Father. Secondarily, it is clear that Mother had limitations due to her abuse of alcohol and drugs and her mental health status.

We find that Mother has addressed these concerns. We find that Mother has had no contact with Father, nor any interest in contacting him. She has complied with the directives of CYS, steadfastly taking advantage of the programs recommended to her, and has continued to do so after CYS' involvement ended. The process has been a long one for her, but she clearly wants to have her children back with her and has worked hard for this to happen. We also note that we awarded her partial custody of her child, Nathaniel, in other proceedings.

Of some concern here is the sporadic contact Mother has had with the minor child. Both sides blame the other for Mother's lack of contact. In reality, many of the reasons are circumstantial. There has been a lack of communication. As a result, the Wells have not been privy to Mother's progress. Mother lives approximately 30 minutes from the Wells' household, and is without transportation. Several of the visits had to be rescheduled

because of scheduling difficulties involving one side or the other, or the supervisor. There is also a degree of mistrust between Mother and the Wells. The Wells are not certain that Mother is now capable of properly caring for the minor child. In addition to the substance abuse and mental health issues, the Wells cite her transience, both in relationships and households. For her part, Mother is concerned that the Wells want to establish themselves as permanent parents of the minor child.

For reasons already set forth, we find that Mother is now able to care for the minor child. Additionally, her frequent moving was adequately explained. She spent time in transitional housing until she was able to move into her own apartment on North 12th Street in Reading. However, due to her landlord's alleged failures, the house was substandard, being without heat for a period of time. After several complaints were lodged by Mother, she sought other housing and recently moved to her current address. We also are satisfied that the Wells have no improper motive here. They are simply caring for the minor child for as long as is necessary. They have no design on becoming the minor child's parents, but would be happy to turn her over to Mother once they are satisfied she can handle the responsibility.

Because Mother has had limited contact with the minor child, it is important for the minor child's continued stability and continuity that she continue to reside with the Wells for a period of time. However, there is no reason why the minor child cannot visit with Mother on weekends. Accordingly, we will order an alternating weekend schedule. This schedule will continue through mid-summer. On July 31, 2010, Mother will assume

primary custody. This will provide her a few weeks before the start of the school year to begin the adjustment as a primary caretaker. Based on their investment and developed love for the minor child, the Wells should be permitted to continue their relationship with the minor child and, therefore, this court will grant them one weekend a month, the weekend to be agreed upon by the parties, but in lieu thereof, to be the first full weekend of every month, as well as such other times as the parties may agree. We enter the following order:

## ORDER

And now, January 14, 2010, after trial held, custody of the minor child, Jocelyn Hine, born September 12, 2005, shall be as follows:

(1) Defendants, Larry Wells and Stacey Wells, shall have sole legal custody and primary physical custody of the minor child from the date of this order through July 31, 2010. After July 31, 2010, the plaintiff, Patricia Hine, shall have sole legal custody and primary physical custody of the minor child.

(2) From the date of this order through July 31, 2010, plaintiff, Patricia Hine, shall have partial physical custody on alternating weekends from Friday at 5 p.m. to Sunday at 5 p.m., with the weekends to be the same weekends she has custody of her child, Nathaniel Di-Guardi, and at such other times as the parties may agree. Subsequent to July 31, 2010, defendants, Larry Wells and Stacey Wells, shall have partial custody of the minor child one weekend per month, the weekend to be agreed upon by the parties, but in lieu thereof, to be the first full

weekend of every month, and at such other times as the parties may mutually agree.

(3) Defendant, Quillen Thrasher, shall have no contact with the minor child until further order of court.

(4) The attached appendix shall be made a part of the within order.

---

## APPENDIX TO ORDER

Certain rules of conduct which generally apply to custody matters are set forth below and are binding on both parties, the breach of which could become the subject of contempt proceedings before this court, or could constitute grounds for modification of this order. If these general rules conflict with any specific provisions of the order, the order shall prevail.

(1) In addition to the foregoing rights, both parties shall also have the following rights with respect to the child:

(A) The right to reasonable telephone contact with the child when he or she is in the other parent's custody.

(B) The right to be fully informed concerning the progress of the child in school and the child's medical status, including the right to obtain the necessary information directly from the child's school or medical practitioner; and

(C) The right to be informed in advance before any important decisions are made concerning the child and the opportunity to participate in those decisions.

(2) In the event of any serious illness of the child at any time, any party then having custody of the child shall immediately communicate with the other party by telephone or by any other means, informing the other party as to the nature of such illness, and during such illness, each party shall have the right to visit the child as he or she desires consistent with the proper medical care of the child.

(3) Neither party shall alienate nor permit to attempt to alienate the child from the other party. While in the presence of the child, neither parent shall make any remarks or do anything which is derogatory or uncomplimentary to the other and it shall be the duty of each parent to uphold the other parent as one the child should respect and love.

(4) Both parties shall provide each other with their addresses and telephone numbers of their residences and anytime they take a trip with the child out of the jurisdiction of Berks County in excess of three days.

(5) The parties shall not conduct arguments or heated conversation when they are together in the presence of their child.

(6) The parties shall, at all times, consider the child's best interests, and act accordingly. It is in a child's best interest to understand that he or she is trying to desperately cope with the fact of his or her parents' separation, and needs help in loving both parents, rather than interference or censure.

(7) Neither party shall question the child as to the personal lives of the other parent except insofar as necessary to insure the personal safety of the child. By this we

mean that the child will not be used as a spy on the other party. It is harmful to a child to be put in the role of spy.

(8) The parties should remember that they cannot teach their child proper moral conduct by indulging in improper conduct themselves. Children are quick to recognize hypocrisy, and the parent who maintains a double standard will lose the respect of his or her child.

(9) Weekend and evening visitation shall be subject to:

(A) Arrangements will be worked out beforehand between the parties without forcing the child to make choices and run the risk of parental displeasure. However, the child shall be consulted as to his or her schedule when appropriate.

(B) Visitation rights shall be exercised at reasonable hours and under circumstances reasonably acceptable to the other party and to the need and desire of the minor child.

(C) If a party finds himself or herself unable to keep an appointment, he or she should give immediate notice to the other party, so as to avoid subjecting the child to unnecessary apprehension and failure of expectations.

(D) The party having custody of the child should prepare him or her both physically and mentally for the transfer of custody to the other party and have him or her available at the time and place mutually agreed upon.

(E) If either party or a child has plans which conflict with a scheduled visit and wish to change such visitation,

318

the parties should make arrangements for an adjustment acceptable to the schedules of everyone involved. Predetermined schedules are not written in stone, and both parties should be flexible for the sake of the child.

(F) If a party shows up for a visit under the influence of alcohol or drugs, the visit may be considered forfeited on those grounds alone.

(10) If either party feels the other party has violated this order, they may petition the court as set forth in Pa.R.C.P. 1915.12.