## Grace v. Wood

*Henry A. Stein,* for plaintiff.
*William H. Lamb,* for defendant.

GAWTHROP, *J.,* January 21, 1982—We have before us what appears to be a matter of first impression in this Commonwealth concerning an aspect of family law recently in the fore: joint custody. Specifically, we have been asked to order a joint-custodial arrangement over the vigorous objections of the

mother. We have done so, and an appeal from that order having been taken, we explain our reasons.

The case arose upon a petition for writ of habeas corpus filed by James Brewster Grace (Brewster), seeking joint custody of his two sons, Jeremy, age 11, and Eric, age 10. Further, the petition included a request for relief concerning the education of the boys. Generally, Brewster sought a substantial voice in the education of his children. Specifically, he objected to Sara's placing the boys in Upland School without consulting him. Thereafter, Sara Wadsworth Wood (Sara), filed a responsive pleading as well as a petition to confirm custody of the boys in her. After four days of hearings, encompassing 1,033 pages of testimony, we entered an order awarding joint custody[1] of Jeremy and Eric to their natural parents, Brewster and Sara. Our order included a provision providing for alternating companionship and control of the children, with Sara having them 60 percent of the time and Brewster 40 percent. Our decision having been appealed, we file the following opinion pursuant to the mandate of

---

1. In awarding joint custody, we directed that both parents share responsibility for the major decisions affecting the lives of their sons. This concept is the same as shared legal and physical custody as defined in the recently passed (November 5, 1981) Custody and Grandparents Visitation Act, Act no. 115 of 1981. The act defines shared custody as: "An order awarding shared legal or shared physical custody or both of a child in such a way as to assure the child or children of frequent and continuing contact, including physical access to both parents." Physical custody is "The actual physical possession and control of a child," while legal custody is defined as: "The legal right to make major decisions affecting the best interests of a minor child, including, but not limited to, medical, religious, and educational decisions." It is this shared legal custody to which Sara objects, having agreed to shared physical custody.

Pa.R.A.P. 1925(b) and address ourselves to the matters complained of on appeal.

## FACTS

Brewster and Sara were married in January, 1966, from which union Jeremy and Eric were born in 1967 and 1969, respectively. As Brewster's work required frequent travel and several relocations, the family lived together in the United States and abroad from 1966 to 1975. During this period, Brewster was either employed or a student, while Sara filled the role of homemaker.

In 1975, while in Singapore, the couple separated. Thereafter, Sara returned with the boys to the United States, with Brewster's consent.

In January, 1977, the couple executed a separation agreement whereby Sara was to have custody and Brewster was to have visitation privileges, including a minimum of every third weekend and 35 consecutive days during the children's summer vacations. The agreement also provided that Brewster pay for the boys' education. In March, 1977, Brewster and Sara were divorced.

Sara was remarried to William P. Wood in March, 1977 and the couple moved to Chester County. Brewster continued to work abroad and in this country following the divorce. In November of 1977, Brewster was married to Ann Grace, returning to the United States in 1978.

Sara and Brewster and their respective families now live less than six miles apart. Both parents are fit and both homes suitable for the rearing of two boys. Both households are financially comfortable and recreational facilities are more than adequate at each abode.

Neither Brewster nor Sara is employed full-time outside the home; Brewster is a consultant and Sara

a homemaker. Thus, both are free to provide considerable attention to the boys. Moreover, each home contains both a step-parent and step-siblings with whom the children can and do happily interact. Both boys expressed positive feelings with respect to each parent's home and the people within them. We conclude from the testimony at trial and interviews with the boys in chambers that both Brewster and Sara provide warm, nurturing homes to Jeremy and Eric. Further, the boys told the court that they would prefer to see more of their father, suggesting a 60 percent/ 40 percent split in custodial time between their mother and father, respectively.

As to the choice of schools, the boys expressed no particular preference, except that Eric, quite understandably, felt that the commute between Friends' School, Haverford, and home in Southern Chester County, was somewhat burdensome. Our order left untouched Sara's choice to have Eric attend Friends' School for his last year there, and she does not appeal this element of the order. In addition to the witnesses and testimony surrounding the situation of the parties, both parties called a number of experts who rendered their opinions and thoughts as to the virtues and drawbacks of joint custody. We are guided by convincing expert testimony that Brewster and Sara, both fit parents, will in short time resolve those irregularities remaining in the joint-custody arrangement. Further, we infer from the relative quiescence of this file since the orders complained of were uttered that the waters are calming.

## ISSUE

The overriding issue before us is whether the children's best interests will be served by their legally being placed under joint custody of both the natural father and mother, rather than remaining under

the sole custody of the mother. We have concluded that the children's interests will be so served.

## DISCUSSION

Preliminarily, we note the fundamental principle, now firmly entrenced in the law of this Commonwealth, is that our polestar is the best interests and welfare of the children. Com. ex. rel. Spriggs v. Carson, 470 Pa. 290, 368 A.2d 635 (1977); Com. ex rel. Parikh v. Parikh, 449 Pa. 105, 296 A.2d 625 (1972); Wenger v. Wenger, 267 Pa. Super. 134, 406 A.2d 555 (1979); Com. ex rel. Grillo v. Schuster, 226 Pa. Super. 29, 312 A.2d 58 (1973). The issue here is not the amount of time the children are to spend with each of their parents. The parties agreed the children shall be with Sara 60 percent of the time and with Brewster the remaining 40 percent. The question is, rather, whether one parent or both should be responsible for making the major decisions affecting the children. Aware that parents, too, have rights,[2] we seek to accommodate the interests of the parents in accordance with the best interests and welfare of the children.

In recognition of our obligation to provide the parties with a full and complete hearing, not merely listening to the immediate witnesses to the matter, but also seeking out disinterested witnesses and expert testimony, we afforded the parties their full day (and night) in court. We heard extensive testimony not only from the parties themselves, the children, and several other witnesses, but also from five expert witnesses — Dr. Emily Hartshorne Mudd, Ms.

---

2. Cf. Ramos v. Rios, 249 Pa. Super. 487, 378 A.2d 400 (1977); Custody of Hernandez, 249 Pa. Super. 274, 376 A.2d 648 (1977).

Judith Greif, Ms. Miriam Galper, Dr. Robert Garfield, and Dr. Kenneth Gordon.

Viewing the household and family situations of Brewster and Sara, we discovered that both provide comfortable, warm and nurturing environments for the boys. We find persuasive the logic of the Missouri Court of Appeals in Lewis v. Lewis, 301 S.W. 2d 861, at 863 (Mo. App. 1957):

"Where the father and mother were proper persons, both are not only entitled to reasonable access to their children, but the best interests of the children will in fact be served by an arrangement where they may associate with both parents . . . it can hardly be denied that the boys, having reached the ages of eight and 10 years, stand in a position where they need guidance, supervision and love and affection of their father as well as their mother."

We deem several factors of particular significance in assisting our decision. We had the advantage that does not, and can never, appear in the cold record, of actually observing Brewster for a protracted period during this trial, both on and off the stand. Our observations of him, confirmed by disinterested eyewitness and expert testimony, impelled our conclusion that his interest in his children is genuine.

Also of major import is the express preference of the nine and 11-year-old sons for a joint-custody arrangement. We found both boys intelligent and mature for their ages. Their preference, as stated for Miriam Galper, Dr. Garfield and this court has been consistent. The boys have been exposed to alternating physical custody and have adapted well. Thus, their preference weighs heavily. In re Snellgrose, 432 Pa. 158, 247 A.2d 598 (1968); Carlisle Appeal, 225 Pa. Super. 181, 510 A.2d 280 (1973); compare Com. v. Hickey, 213 Pa. Super. 349, 242 A.2d 806 (1968).

Other factors include the minimal disruption this arrangement shall cause the children and the adequacy of both parents' homes. Brewster and Sara live quite near to each other, allowing the children to reach friends and school with relative ease, considering they live in a semi-rural area. Both parents have the resources to provide comfortable surroundings for the children.[3] There is nothing in either of these factors to weigh in favor of one parent over the other. In fact, the physical surroundings and locations work in favor of joint custody, making it a reasonable alternative.

We believe the benefits to the children of having their parents share responsibility for major decisions outweighs the detriments. We expressly disapprove of the common situation where the noncustodial parent is ousted from the child's life, and barred from the decision-making process. Being the custodial parent in no way accords the right to have the other parent kept in the dark. If a sole custodial parent has the ultimate authority, possessing the power and the legal right to decide, then it inexorably follows that the noncustodial parent's beliefs are capable of utter disregard. Such result we here seek to avoid, for we believe it not in the best interests of the children to have one parent so powerless. In expressing such general disapprobation, we do not suggest that Sara has so excluded Brewster; rather, this must not happen in the future.

---

3. Sara, on appeal, protests that her sons' responsibility for their pets will be curtailed by spending 40 percent of their time with their father. She, however, agreed to this time arrangement. We are at a loss to see how joint legal custody, as opposed to joint physical custody, has any effect on this. So also, we believe that if we were to let our determination of custody depend upon this relatively minor factor, we really would be letting the tail wag the dog.

The harm to the children with only one parent having significant input into the major decisions is that, as the experts before us testified, even young children are sufficiently perceptive to begin to sense the lesser status of the noncustodial parent. This perception, in turn, detracts from the parent-child relationship. As the New Jersey Supreme Court observed in Beck v. Beck, 86 N.J. 480, 432 A.2d 63, 65 (1981):

"Sole custody tends both to isolate children from the noncustodial parent and to place heavy financial and emotional burdens on the sole caretaker . . . see Bratt [Joint Custody], 67 Ky. L.J. [271] at 275 [1979]; Miller, Joint Custody 13 Fam. L.W. 345, 354-57 (1979) . . . Moreover, because of the absolute nature of sole-custody determinations, in which one parent 'wins' and the other 'loses', the children are likely to become the subject of bitter custody contests and post-decree tension. Id. at 355. The upshot is that the best interests of the child are disserved by many aspects of sole custody."[4]

---

4. In citing Beck, we do not overlook a more recent authority out of New Jersey, Mastropole v. Mastropole, 87 Fam. L.R. 1025, 2091 (November 10, 1981). There the New Jersey Superior Court, Appellate Division, reiterated: "[b]efore embarking on a full-blown inquiry into the practicality of a joint-custody arrangement, the court must determine whether the [child] has established such [a] relationship with both parents that [he] would benefit from joint custody," and "that the child recognize[s] both parents as sources of security and love and wish[es] to continue both relationships." 8 Fam. L.R. 2092. At bar, this threshold test is clearly met, evidenced both by the testimony of the children, in chambers, and of the parties themselves.

A second factor cited in Mastropole was whether the parties "exhibit a potential for cooperation in matters of child raising." At bar, although Brewster and Sara have, at the very least, given off undertones of rancor, we cannot say that it is of

We believe that each of these parents, both of whom we find to be intelligent, mature, fine people with the best interests of their children at heart, has the right to have a voice in his or her children's future. We found the expert testimony of Dr. Garfield, Ms. Greif, and especially Ms. Galper, of particular assistance in regard to the nature of joint custody and its probable effect on the boys.[5] Joint custody is understood as an arrangement where "[B]oth parents have equal responsibility for *all* decisions involving the children and alternating and equal companionship and control of the children." Where adopted, it is favored because it allows for continuity of relationship between the children and both par-

---

such a degree as to rule out cooperation in such matters. Indeed, the obvious maturity that Brewster and Sara have displayed in accepting — at least for now — our decree and in working within its framework, as demonstrated, for example, by their schooling agreement achieved after our ruling, would seem to bear out our perception of their cooperative potential.

Finally, we observe and endorse the thinking of Mastropole, disapproving the arrangement there: "[T]he constant shuttling of [the child] between his father and his mother every few weeks, week in and week out, will be disruptive of the stability essential to [his] emotional well-being and development. 8 Fam. L.R. at 2092. We believe the superior arrangement is as at bar, with blocks of time being accorded each of the parties with the children, the children being allowed to have two real homes, with the 60 percent home being the principal domicile (see, generally, the testimony of Dr. Kenneth Gordon, summarized at fn. 5, infra), rather than having them relegated to the status of juvenile gypsies.

5. Dr. Gordon testified that a 50/50 joint custody arrangement would be detrimental to the children, who need a place which they may call home. Recognizing this, we ordered that a majority of the boys' time be spent with their mother. However, we ordered that the parents share equally major decisions affecting the children in the strong belief that each parent should have a meaningful say in the lives of their sons.

ents. Thus, joint custody may reduce the harmful deterioration and deprivation of those parent-child relationships considered vital to the children's welfare.

As the New Jersey Superior Court has said: "No order of sole custody in the mother, even with unlimited visitation by the father, could possibly give these children the contact with their father that they need and have a right to." Mayer v. Mayer, 150 N.J. Super. 556, 376 A.2d 214, 220 (1977).

We note that in child-custody cases, it has become fundamental in this Commonwealth to award custody with " 'regard first being had' to the relative fitness of contesting parents and 'the best interests and *permanent welfare*' of the child. Act of June 26, 1985, P.L. 316 §2, 48 P.S. §92." Ellerbe v. Hooks, 490 Pa. 363, 416 A.2d 512 (1980). (Emphasis supplied.) Thus, neither party bears the burden of proof; rather, both contestants share it equally while the children's welfare remains the focus of the consideration. As earlier stated, we find both parents fit, and that it is in the best interest of the children that both parents share responsibility for rearing the boys. Brewster strongly desires it, the children wish it, and the parties live in proximity, making it feasible.

In this Commonwealth there has been no statutory presumption favoring sole custody, though it has predominated. We thus see no bar to implementing whatever custody arrangement best serves the interest of the children. Joint custody is recognized as a valid, and in some jurisdictions, a favored alternative to sole custody.[6]

---

6. Wisc. Stat. Ann. §247.24 (1978); Oregon Rev'd. Statutes §167 105 (1977); Iowa Code Ann. §598.21 (1977); Odette R. v. Douglas R., 91 Misc. 2d 722, 399 N.Y. Supp. 2d

The legislature of this Commonwealth, on November 5 of last year, passed a bill titled the Custody and Grandparents Visitation Act (Act), which expressly permits courts to order joint custody. The stated purpose of the act is as follows (Act 1981-115, §2):

"The General Assembly declares it is the public policy of this Commonwealth, when it is in the best interest of the child or children, *to assure a reasonable and continuing contact of such child or children with both parents* after a separation or dissolution of marriage, *and a sharing of the rights and responsibilities of child rearing by both parents.*" (Emphasis added.) This was precisely our aim in ordering joint custody (known as shared custody under the act) here: to assure continuing contact and a sharing of rights and responsibilities by both parents.

Significantly, the act permits a court in its discretion to order shared custody, if in the best interests of the child, even though neither party has requested it. Id., §5(3). Though the courts of the Commonwealth have not been barred from ordering joint, or shared, custody, none, to our knowledge, has done so on its own initiative. This language is a strong urging that we actively consider the feasibility of shared, or joint, custody. Though we did not anticipate passage of the act when joint custody was ordered here, we believe adoption of the act confirms

93 (1977); McLemore v. McLemore, 346 S.W. 2d 722 (Ky. Ct. App. 1961); Travis v. Travis, 163 Kan. 54, 180 P.2d 310 (1941); Ramsden v. Ramsden, 32 Wash. 2d 603, 202 P.2d 920 (1949); Winn v. Winn, 143 Cal. App. 2d 184, 299 P.2d 721 (1956); Stamper v. Stamper, 3 Fam. L.R. 2541 (Mich. Cir. Ct. 1977); Gillespie v. Gillespie, 6 Fam. L.R. 2106 (E.D., Mo. Ct. App. 1979).

our judgment of the potential usefulness of such an arrangement.

We also note that the act permits entry of an order of shared custody at any time. The act, §11, provides that any custody order may "be modified at any time to an order of shared custody in accordance with the provisions of this section." Had we denied joint custody due to its novelty, Brewster could seek it by petitioning after the effective date of the act. In hindsight, our order, based on the best interests of the children, may be an act of judicial economy.

In her statement of matters complained of on appeal, Sara raises a series of issues to which we now turn our attention.[7] It is asserted we erred in sustaining objections to appellant's questions to Brewster on his ties to a religious organization. The objections were properly sustained. See Com. v. Mimms, 477 Pa. 553, 385 A.2d 334 (1978). Compare McKim v. Philadelphia Transport Company, 364 Pa. 237, 72 A.2d 122 (1950). Questions relating to one's religious convictions are specifically proscribed by statute in this Commonwealth. The Act of April 23, 1901, P.L. 140 §3, 28 P.S. §313, provides in pertinent part:

"No witness shall be questioned in any judicial proceeding, concerning his religious beliefs; nor

---

7. Mrs. Wood complains, in paragraph seven, that there is no evidence that the parties will be able to agree on blocks of time. The issue is moot, since the parties have so agreed. Similarly, the issue raised in paragraph 12 is moot. It deals with evidence that sole custody by Mr. Wood of Jeremy was a condition of his acceptance at Upland School. Jeremy has been accepted by the school. Counsel for Mrs. Grace ostensibly raises several constitutional objections to our order. Due to the vagueness of the complaints (paragraphs 18, 19), we do not address them.

shall any evidence be heard upon the subject, for the purpose of affecting either his competency or credibility." Id. So also, because of this statute and its interpretive caselaw, we need not reach the Constitutional question. But we do have a certain constitutional, as well as visceral, distaste for the inquisition into one's religious beliefs.

Likewise, we did not err, as alleged, in sustaining objections to the questioning of Miriam Brown as to her observations as a professional educator of the effect of joint-custody arrangements on children whom she had seen in school. Such testimony as to other children, with other parents, with scores of other variables, known and unknown, we believe, would not have advanced the inquiry and thus had no probative value. Com. v. McCusker, 448 Pa. 382, 292 A.2d 288 (1972). Testimony regarding other children would have opened the doors to litigating a dozen custody cases, rather than just one. The effect of joint custody on those other individuals was not at issue. Thus, our ruling.

Sara asserts in another matter complained of on appeal that "the court committed an error of law when it relied on Ramos v. Rios, 249 Pa. Super. 487, 378 A.2d 400 (1977), and In Re Custody of Hernandez, 249 Pa. Super. 274, 376 A.2d 648 (1977), to support the conclusion that parents' rights' [sic] might be considered in addition to the best interests of the children in a contest between two natural parents." Preliminarily, we note that although the precise holdings of the cited authorities obviously are not squarely on point, the cases do contain language and law which sheds helpful light on the proper resolution of the case before us.

The thrust of both the Hernandez and Ramos v. Rios decisions was that parents have a prima facie right to custody of their children. We realize, of

course, that those cases turned on a custody battle between a parent and a third party, and this case is one between parents. Nevertheless, we believe that Hernandez, for example, does stand for the proposition that parents have certain rights: "Thus it may be said that the basis of the father's right to custody and the basis of the mother's right are the same: each has a biological relationship to the child; and each has the obligation to support the child." Hernandez, supra, 376 A.2d at 651, fn. 2. This principle was reaffirmed in Ellerbe v. Hooks, supra, 416 A.2d at 514:

"Viewed in this light, deference to the parental relationship is not an archaic adherence to any property-rights theory of the family. Rather, as the United States Supreme Court has stated: 'The private interest here, that of a man and the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection.' 'It is plain that the interest of a parent in the *companionship, care, custody, and management* of his or her children come[s] to this court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements.' " Kovacs v. Cooper, 336 U.S. 77, 95, 69 S. Ct. 448. (Emphasis added.)

So also in Wisconsin v. Yoder, 4060 U.S. 205, 232, 92 S. Ct. 1526, 1541-42 (1972), the court observed:

"[T]his case involves the fundamental interest of parents, as contrasted with that of this state, to guide the religious future and education of their children. The history and culture of Western civilization reflect a strong tradition of parental concern for the nurturing and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as

an enduring American tradition." It is plain from these landmark cases that the court did not err in considering the rights of the parents[8] as well as the best interests of the children in this proceeding.[9]

---

8. Again, we recognize that the actual language of the fifth matter complained of was that we erred in *relying upon* these two cases in reaching our conclusion. The following paragraph, six, in the statement, expressly states that the court erred in basing its decision in part on parents' right rather than (solely) the best interests and welfare of the children.

9. Counsel for Sara raise an argument which we consider frivolous, but nevertheless, feel compelled to address. Counsel assert that a petition for writ of habeas corpus is not the proper procedure for determining custody of these children. In her brief, counsel argues that a writ of habeas corpus is only appropriate to seek to free an imprisoned person. This is simply not the law. Use of the writ in cases involving custody of children is deeply embedded in a rich precedential tradition. As the United States Supreme Court stated in New York Foundling Hospital v. Gatti., 203 U.S. 429, 438, 27 S. Ct. 53, 55, 51 L. Ed. 254 (1906):

"There is no reason to doubt that originally the common-law writ was granted solely in cases of arrest and forcible imprisonment under color or claim of warrant of law.

"As late as 2 James II, the court expressly denied its allowance in a case of detention or restraint by a private person (Rex v. Drake, Comb. 35; 16 Vin. Abr. 213), and the habeas corpus act of Charles II, which is claimed as the Magna Charta of British liberty, has relation only to imprisonment on criminal charges (3 Bacon, Abr. 438, note).

"It is not important to inquire at what period the writ first was employed to place infant children under the disposal of courts of law and equity. This was clearly so in England, anterior to our Revolution (Rex v. Smith, 2 Strange, 982; Rex v. Delaval, 3 Burr. 1434; Blisset's Case, Lofft. 748), and the practice has been fully confirmed by those courts unto the present day (King v. De Manneville, 5 East, 221; De Manneville v. De Manneville, 10 Ves. Jr. 52; Ball v. Ball, 2 Sim. 35; Ex parte Skinner, 9 J.B. Moore, 278; King v. Greenhill, 4 Ad. & El. 624); and this indifferently, whether the interposition of the

court is demanded by the father or mother (4 Ad. & El. 624), ubi supra; 9 J.B. Moore, 278, ubi supra.

• • •

"The authority to take cognizance of the detention of infants by private persons, not held under claim or color or warrant of law, rests solely in England on the common law. It is one of the eminent prerogatives of the Crown, which implies in the monarch the guardianship of infants paramount to that of their natural parents. The royal prerogative, at first excercised personally ad libitum by the King (Kendall v. United States, 12 Pet. 630, 9 L. ed. 1223), and afterwards, for his relief, by special officers, as the Lord High Constable, the Lord High Admiral, and the Lord Chancellor, in process of time devolved upon the high courts of equity and law, and in them this exalted one, of allowing and enforcing the writ of habeas corpus ad subjiciendum, became vested as an elementary branch of their jurisdiction. In the performance, however, of this high function in respect to the detention of infants by parents, etc., the court or judge still acts with submission to the original principle, out of which it sprang, that infants ought to be left where found, or be taken from that custody and transferred to some other, at the discretion of the prerogative guardian, and according to its opinion of their best interest and safety.

"It was in the exercise of this jurisdiction as parens patriae that the present case was heard and determined. It is the settled doctrine that in such cases the court exercises a discretion in the interest of the child to determine what care and custody are best for it in view of its age and requirements. Such cases are not decided on the legal right of the petitioner to be relieved from unlawful imprisonment or detention, as in the case of an adult, but upon the court's view of the best interests of those whose welfare requires that they be in custody of one person or another. In such cases the question of personal freedom is not involved except in the sense of a determination as to which custodian shall have charge of one not entitled to be freed from restraint."

So also did no less a personage than Judge (later Justice) Cardozo have occasion to consider the applicability of habeas corpus to the child-custody contest:

"Except when adjudged as an incident to a suit for divorce or separation, the custody of children is to be regulated as it has always been in one or other of two ways: By writ of habeas

corpus, or by petition to the chancellor. Queen v. Byngall, 1893, 2 Q.B. Div. 232, 238 . . . We find no sufficient reason for discarding this historic remedy and establishing in its place, or even as a supplement, a remedy of action. . . . The remedy by action is . . . seen to be incongruous in principle. It is more than that, however; it is cumbrous, expensive, and dilatory in practice. There must be pleadings and notices of trial and crowded calendars and formal proofs. The remedy by petition is summary and cheap and swift. It comes to us established and consecrated by tradition and practice immemorial. We are unwilling to displace it by a less efficient innovation." Finlay v. Finlay, 240 N.Y. 429, 148 N.E. 624, 626 (1925). The use of the Writ of Habeas Corpus as the vehicle for adjudicating this case was entirely proper at the time of this hearing. Cf. Pa. Bulletin, Vol. 12, no. 2, January 9, 1982, pp. 118-129.