**Short v. Finogle**

116

C.P. of Bradford County, no. 94FC000881.

SMITH, *P.J.,* January 30, 1997—This action for custody of a 3-year-old boy is brought by plaintiff Rhonda Finogle, the natural mother, and plaintiff Robert Finogle, the maternal grandfather, against defendants Brian and Aleene Short, who are not related to the child, but who were granted legal and primary physical custody of the child based on an agreement with the mother. The agreement was executed and made an order of court on November 18, 1994, when the child was little more than 1 year old. The complaint for custody was filed in February 1995, and in April of 1995, the parties entered into a stipulation, adopted as an order of court, which provided plaintiffs with a definite schedule of visitation. The natural father, though named as a defendant, did not participate in the proceedings.

I.

The first task of the court is to determine the standard which controls a custody dispute between, on the one hand, a natural parent and, on the other, a third party.

Recently, in *Rowles v. Rowles,* 542 Pa. 443, 668 A.2d 126 (1995), three justices of the Pennsylvania Supreme Court joined in an opinion announcing the judgment of the court which, in reversing the Superior Court's affirmance of the trial court's award of custody to grandparents, "abandon[ed] the presumption that a parent has a prima facie right to custody as against third parties . . . ." *Id.* at 447-48, 668 A.2d at 128. *Rowles* urged replacement of the natural parents' prima facie right to custody with a rule weighing parenthood as a strong factor for consideration in custody determinations. The presumption that a parent has a prima facie right to custody as against third parties was established as the law of Pennsylvania by a majority of the Pennsylvania Supreme Court in *Ellerbe v. Hooks,* 490 Pa. 363, 416 A.2d 512 (1980).

Despite purporting to identify "the standard governing custody disputes between parents and third parties," *Rowles* should not be read to have abrogated the clear precedent of *Ellerbe. Rowles, supra* at 448, 668 A.2d at 128. Because *Rowles* was not an opinion of a majority of the Supreme Court, it is not decisional and is of no precedential value. *Commonwealth v. Covil,* 474 Pa. 375, 378 A.2d 841 (1977); *Mt. Lebanon v. County Board of Elections of the County of Allegheny,* 470 Pa. 317, 368 A.2d 648 (1977); *Commonwealth v. Silverman,* 442 Pa. 211, 275 A.2d 308 (1971); *Emerick v. Carson,* 325 Pa. Super. 308, 472 A.2d 1133 (1984); *Majestic v. PennDOT,* 144 Pa. Commw. 109, 601 A.2d 386 (1991). Quite simply, the three justices joining the

opinion announcing the judgment in *Rowles* were not a majority and could not overturn the precedent rendered by the majority in *Ellerbe.* Nonmajority decisions of the Supreme Court are not binding on the lower courts, *Commonwealth v. Minor,* 436 Pa. Super. 35, 647 A.2d 229 (1994); they are to be considered only for their persuasive value. *Covil, supra.*

Even in the absence of the binding precedential authority of *Ellerbe,* the persuasive value of the opinion announcing the judgment in *Rowles* is not such as would persuade this court that *Rowles* advances the judicial pursuit of the best interests of children who are the subject of custody litigation. The practical effect on custody decisions of the standard urged in *Rowles* is negligible at best, but carries the potential for unintended harm to the primacy of the status of parent, a status bearing protections of constitutional dimensions. In contrast, *Ellerbe* "reflects the important need for restraint in an area where the judiciary should proceed with the utmost caution." *Id.* at 368-69, 416 A.2d at 514.

Under the *Ellerbe* standard, "before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the parents' side." *Id.* at 367, 416 A.2d at 514, quoting *In re Hernandez,* 249 Pa. Super. 274, 286, 376 A.2d 648, 654 (1977). On the other hand, *Rowles'* evidentiary weighing of parenthood as a strong factor actually does no more than tip the scales hard to the parents' side *after* the proceedings start, that is, once there is proof that one party is a parent. *Rowles* adds nothing to calculation of the degree to which parenthood tips the scales and, at trial's end, the judge is no better informed of his duty.

The soul of *Rowles* derives from its author's concurrence in *Ellerbe* which asserts:

"[T]he underlying tenor of the 'presumption' [that parents have a prima facie right to custody] reflects

an archaic concept that children are proprietary assets of parents. Serious question may be posed with respect to the soundness of the apriorism that mere biological relationship assures solicitude, care, devotion, and love for one's offspring." *Rowles, supra* at 447, 668 A.2d at 128, quoting *Ellerbe v. Hooks, supra* at 372-73, 416 A.2d at 516 (Flaherty, J., concurring).

This "underlying tenor" which *Rowles* would exorcise is a "straw man." The concept of children as proprietary assets is rightly criticized as archaic, but in fact it plays no role in child custody. In truth, "[t]he rights to conceive and to raise one's children [are] 'rights far more precious . . . than property rights.'" *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), quoting *May v. Anderson,* 345 U.S. 528, 533, 73 S.Ct. 840, 97 L.Ed. 1221 (1953). They are deemed "essential," *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), "basic civil rights of man." *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). The *Rowles* standard would therefore do no less than reduce the essential, basic civil right of parenthood to a mere piece of evidence. To be sure, *Rowles* would ascribe parenthood "significant weight," but is unwilling even to make parenthood the "paramount" factor in determining the best interests of children in custody disputes. *Id.* at 448, 668 A.2d at 128.

That *Rowles* assigns great weight to the status of parent and commendably seeks avoidance of presumptions in judicial determinations of the best interests of children does not justify its casual treatment of the high regard which the United States Constitution ascribes to the family unit. See *Stanley, supra,* citing *Meyer, supra,* (protection of family found in due process clause of Fourteenth Amendment), *Skinner, supra,* (pro-

tection found in equal protection clause of Fourteenth Amendment), and *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (Goldberg, J. concurring) (protection found in Ninth Amendment). Were the judiciary to treat one's status as a criminal defendant as nothing more than a weighty factor for consideration in determining guilt or innocence, we would not be heartened by the thought that some difficulty inherent in a presumption had been avoided. Presumptions having a foundation in the constitution should not be shunned by the courts; they should be given a protective embrace.

The notion that the presumption in favor of natural parents derives from nothing more than "an archaic concept that children are proprietary assets of parents," *Rowles, supra* at 447, 668 A.2d 128, is a chimera. What is archaic, however, and utopian if not Orwellian, is the statism implicit in an approach which so easily supplants parental determinations of a child's best interest with judicial determinations.

"That the state may do much, go very far, indeed, in order to improve the quality of its citizens, physically, mentally and morally, is clear; but the individual has certain fundamental rights which must be respected . . . . [A] desirable end cannot be promoted by prohibited means.

"For the welfare of his Ideal Commonwealth, Plato suggested a law which should provide:

"The wives of our guardians are to be common, and their children are to be common, and no parent is to know his own child, nor any child his parent . . . . The proper officers will take the offspring of the good parents to the pen or fold, and there they will deposit them with certain nurses who dwell in a separate quarter; but the offspring of the inferior,

or of the better when they chance to be deformed, will be put away in some mysterious, unknown place, as they should be.

"Although such measures have been deliberately approved by men of great genius their ideas touching the relation between individual and state were wholly different from those upon which our institutions rest . . . ." *Meyer, supra,* 262 U.S. 390, 401-402.

*Rowles* dismisses our tested, institutional respect for the relationship between parent and child by describing the relationship as "mere[ly] biological;" further, the expectation, born of experience, that the relationship between parent and child will foster love, care and devotion is likewise dismissed by *Rowles* as an "apriorism." *Id.* at 447, 668 A.2d at 128. Biology is instructive, however. It is perfectly efficient, allowing the survival of only those species which adequately nurture their offspring, and there does not spring to mind any species which survives by one member taking the offspring of the other. Moreover, if the presumption that a parent has a prima facie right to custody as against third parties stems from an apriorism, so too does the pronouncement that parenthood should be a strong factor in determining the affiliation that best serves the child's interest. The latter is justified in *Rowles* as a move towards clarity in child custody proceedings, but the former rests on much firmer ground.

"The right to . . . parental autonomy, as well as the reciprocal liberty interest of parent and child in the familial bond between them, need no greater justification than that they comport with each state's fundamental constitutional commitment to individual freedom and human dignity." *Lehman v. Lycoming County Children's Services,* 648 F.2d 135, 163 n.9 (3d Circuit, 1981) (Rosenn, J., dissenting) quoting Goldstein, Medi-

cal Care for the Child at Risk: On State Supervention of Parental Autonomy, 86 Yale L.J. 645, 649-50 (1977).

*Rowles* would be more compelling if empirically the *Ellerbe* standard had proven confusing or unworkable, however, there is no basis to conclude that our trial courts, applying the *Ellerbe* standard, have failed to make decisions in custody disputes between parents and third parties in a manner that is consistent with the best interests of the children involved. This court has reviewed every Pennsylvania appellate court decision making a citation to *Ellerbe* and, with but one exception,[1] there are no cases where our appellate courts have concluded that the trial court's award of custody to the natural parent failed to comport with the best interest of the child. Yet *Ellerbe* has been the standard in Pennsylvania for 16 years. Thus, there is no experiential foundation for the fear expressed in *Rowles* that the *Ellerbe* standard "merely beclouds the . . . determination of what . . . will best serve the child's

---

1. The one case resulting in reversal of the trial court is *E.A.L. Sr. and J.L.L. v. L.J.W.,* 443 Pa. Super. 573, 662 A.2d 1109 (1995). The result in that case can scarcely be said to indict the *Ellerbe* standard, because it is apparent that the trial court would have reached the same erroneous conclusion under *Rowles.* The trial court's too-heavy reliance on the appellee's status as natural parent was but one in a plethora of errors. The trial court also erred (1) in failing to consider the children's rational preferences, (2) in placing too much emphasis on the policy favoring the rearing of siblings together, (3) in failing to consider the effect on the children of the difficult transition from their grandparents to their mother, (4) in failing to require expert testimony on the effect the transfer would have on the children, (5) in failing to require testimony from the mother's husband, with whom the children would be spending significant time, and (6) in failing to consider whether the mother and her husband obstructed visits with the grandparents, who had raised the children, ages 10 and 12, since birth.

interests . . . ." *Rowles, supra* at 447, 668 A.2d at 128, quoting *Ellerbe, supra* at 374, 416 A.2d at 516-17 (Flaherty, J., concurring).

While it might be argued that because *Rowles* would do no more than change the point in time that the evidentiary scales in a custody case are tipped in favor of the natural parent, it is harmless polemic; but the danger lurking in *Rowles* is in the unknown, unintended consequences. Ever-so-slightly, but distinctly, *Rowles* tends to marginalize parenthood. The law has long recognized that the status of parent embraces not just parental rights, but parental obligations, as well. "It is cardinal . . . that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince v. Commonwealth of Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944). It follows that if the legal significance of parenthood is diminished, it is not parental rights alone which will be enervated; so too parental obligations. At a time when there is near-universal recognition that the fraying of the fabric of American society is due in no small part to the declining influence of parents upon their children, the judiciary should not weaken historic and constitutional expectations of the role to be played by parents. At a time when our co-equal branches of government look to strengthen the influence of family, the Pennsylvania judiciary should not take an uncharted course that, at the least, permits the perception that parenthood has become less important in the eyes of the law. Instead, the judiciary ought to reaffirm the primacy of parenthood by providing stalwart protection to parents' inherent rights, coupled with more rigorous, exacting demands upon parents' obligations. There is no inconsistency in providing greater protection of parental rights in law, while simultaneously demanding greater protection of children in fact.

It cannot be emphasized too strongly that *Rowles* ignores the constitutional protections afforded the status of parent, but *Rowles* offers no compelling argument that it truly advances the pursuit of the best interests of children.

Having concluded that *Rowles* is neither authoritative nor persuasive, and having concluded that the *Ellerbe* standard, which recognizes a natural parent's prima facie right to custody, remains the law of Pennsylvania, the court will turn to the specific question whether the best interests of the child at issue in this case dictate the child's return to the custody of his natural mother.

## II.

Plaintiff Rhonda Finogle gave birth to her son in October 1993. At the time, she was 18 years of age and was at odds with her father, plaintiff Robert E. Finogle. She was, by her own admission, embarrassed and ashamed. She exercised very poor judgment in her associations, engaged in some criminal activity, including retail theft, receiving stolen property, and forgery, and was not altogether discriminating in her relationships with men. She was unemployed and receiving public assistance.

When the child was first born, plaintiff Rhonda Finogle lived with Judy and William Welch, who are the sister and brother-in-law of defendant Aleene Short. When the child was approximately 6 months old, plaintiff Rhonda Finogle left the Welches' home and began living with various friends, but returned to the Welches' in August 1994. In November 1994, plaintiff Rhonda Finogle entered into a written agreement with defendants, granting them legal and primary physical custody of her child, but permitting plaintiff Rhonda Finogle to enjoy partial custody as might thereafter be agreed

by the parties. From the child's birth to the time of the agreement placing the child in defendants' custody, plaintiff Rhonda Finogle's care and attention to the child was inadequate. She lacked both the financial resources and the inclination to provide a suitable home for the child. Fortunately, defendants and the Welches were always willing to provide whatever assistance was needed.

Defendants sought throughout the custody trial to prove that plaintiff Rhonda Finogle has, on several occasions, entered into discussions with defendants concerning not only granting custody of the child to defendants, but permitting defendants to adopt the child. Plaintiff Rhonda Finogle acknowledged only that prior to the birth of the child, she considered allowing the child to be adopted. The differences in the parties' contentions on this point are not significant, because the evidence leads the court to conclude that any consideration which plaintiff Rhonda Finogle gave to adoption, whether before or after the birth of the child, was motivated by plaintiff Rhonda Finogle's concern for the child. There was no convincing evidence whatsoever that plaintiff Rhonda Finogle was acting selfishly in contemplating allowing an adoption; rather she recognized that her unsettled lifestyle was not the best for her baby. Instead of being the negative factor which defendants sought to make it, plaintiff Rhonda Finogle's consideration of adoption reflects positively upon her, as does her willing grant of custody to defendants.

Defendants also sought to prove that plaintiff Rhonda Finogle rejected adoption and sought custody only so she could receive public assistance payments for the child. Defendants' evidence of this contention was thoroughly unconvincing, not merely because it was denied by plaintiff Rhonda Finogle. The court's conclusion

is that plaintiff Rhonda Finogle had simply expressed her belief that with public assistance she could raise the child herself.

Defendants also claimed that plaintiff Rhonda Finogle had been physically abusive to the child and, through neglect, allowed the child to suffer bruises. Defendants did not meet their burden of persuading the court that their accusations were true.

Plaintiff Rhonda Finogle has now made significant strides in changing her lifestyle for the better. Perhaps most significantly, she has had a rapprochement with her father, plaintiff Robert Finogle. According to the court-ordered psychological evaluation of plaintiff Rhonda Finogle,[2] her developmental problems are connected to negative experiences as a teenager when she lived with her mother and stepfather. Thus, a healthy relationship with her father, who impresses the court as a steady and loving influence for both plaintiff Rhonda Finogle and her child, will likely help plaintiff Rhonda Finogle overcome the social and emotional deficits which arose during her adolescence.

Plaintiff Rhonda Finogle has also exhibited her greater maturity and responsibility by obtaining her graduation equivalency diploma in January 1996, remaining employed at Paper Magic, in Troy, Pennsylvania, since May 1995, and remaining free of any criminal conduct since 1994. Together with her father, she regularly exercises her partial custody rights, which permit her to

---

2. After the trial, the court concluded that a psychological evaluation of plaintiff Rhonda Finogle was necessary. Copies of the evaluation were provided to counsel and counsel were directed to inform the court whether the evaluation could be admitted without testimony from the evaluator or whether either party wished to take testimony from the evaluator. Both parties have agreed that the court could consider the evaluation without the necessity of testimony.

see her son every weekend. The partial custody alternates weekend to weekend: on one weekend, the child is with plaintiffs from Friday evening to Sunday evening; on the next weekend, the child is with plaintiffs from Saturday afternoon to Sunday evening. The visitations between plaintiff Rhonda Finogle and the child have occurred without incident since February 1995.

While working at Paper Magic, plaintiff Rhonda Finogle met her current paramour, Christopher Williams. They began living together shortly thereafter and continue to do so. Mr. Willliams's son also lives with them. Mr. Williams testified at the custody trial and he acknowledged that his past difficulties with the court with respect to his child support obligations made him a reluctant witness. The pendency of the custody trial had strained his relationship with plaintiff Rhonda Finogle, but there is no evidence to suggest that the relationship between Mr. Williams and plaintiff Rhonda Finogle is less than healthy for Mr. Williams, his son, plaintiff Rhonda Finogle and her son.

A psychological evaluation was ordered by the court for plaintiff Rhonda Finogle only. There was and is no suggestion that defendants are not mentally, morally, psychologically, and physically fit custodians. They have provided a modest, but loving, caring, stimulating, healthy, and safe home for the child. From all appearances, the child is happy, well-adjusted, and comfortable in their home. Defendant Brian Short has worked as a foreman at a coal mine since 1990. He provides an income that is certainly sufficient to meet the material needs of the child. There is no reason to doubt that the child would continue to be well cared for in defendants' home.

The first psychological evaluation of plaintiff Rhonda Finogle was performed by Charles Cornwall, a licensed

psychologist and a registered child custody evaluator. His evaluation was later supplemented by another licensed psychologist, Lisa D'Addio.[3]

Mr. Cornwall conducted a clinical interview and a Millon Clinical Multiaxial Inventory. During a playroom observation, Mr. Cornwall, together with Linda Mihalek, a licensed social worker,[4] observed interaction between plaintiff Rhonda Finogle and the child which was "quite acceptable." Plaintiff Rhonda Finogle demonstrated empathy for defendants, but appeared to minimize the potential harm to the child if legal and physical custody should be granted to her. Mr. Cornwall opined that plaintiff Rhonda Finogle demonstrates "psychological dysfunction of a mild/moderate severity" and he predicted "with some probability repetitive problems in significant adult roles." He did not recommend that plaintiff Rhonda Finogle not be granted custody, but cautioned that any change in custody should be done "with utmost sensivity" to the child; "otherwise, there is the risk of traumatic loss to be suffered by" the child, "which could have unforeseen impact on his development."

Ms. D'Addio conducted a clinical interview and submitted plaintiff Rhonda Finogle to a Minnesota Multiphasic Personality Inventory. Ms. D'Addio concluded that plaintiff Rhonda Finogle "may be at risk for developing a substance abuse and/or dependency problem." She did not suggest that plaintiff Rhonda Finogle is presently abusing substances. In fact, the evidence is to the contrary, but it is plain that plaintiff Rhonda

3. Ms. D'Addio was consulted by plaintiff Rhonda Finogle and her attorney. Again, the parties agreed that the report be admitted into evidence without further testimony.

4. Mr. Cornwall and Ms. Mihalek have teamed to provide dozens of custody evaluations for this court.

Finogle must exercise caution in such matters. Ms. D'Addio further concluded that plaintiff Rhonda Finogle "may not always be able to make appropriate judgements [sic]" and "would be prone to acting impulsively." Finally, Ms. D'Addio recommended that plaintiff Rhonda Finogle receive supportive counseling, but that "[a]ll opportunities for contact between [the child] and [plaintiff] Rhonda [Finogle] should be allowed and encouraged."

From all of the foregoing, it is the court's conclusion that legal and primary physical custody of the child should be granted plaintiff Rhonda Finogle. Although the psychological evaluations of Mr. Cornwall and Ms. D'Addio signal the need to proceed slowly and cautiously, plaintiff Rhonda Finogle has demonstrated to this court that despite her psychological dysfunction she can safely care for her child. She has apparently coped with or has overcome the difficulties of her adolescence for a period of approximately two years. Her recent behavior does not bear out the diagnoses of the psychological reports, but the reports inform the court of the need to continue to monitor and manage the transition of primary physical custody from defendants to plaintiff Rhonda Finogle. Imperative to such a transition is the need for the continued support of plaintiff Robert Finogle, who will surely not allow the child to be placed in danger and who will serve as an appropriate guardian, in the general sense of the word. Also imperative is the need for all parties to engage in counseling to enable them to best understand the needs of the child and each other. Barring unforeseen circumstances, defendants must continue to have an active and significant role in the life of the child, not merely because they have come to love the child, but because the child has come to love them.

## ORDER

And now, January 30, 1997, for the reasons set forth in the accompanying opinion, the court directs as follows:

(1) legal custody of Tyler Finogle is hereby awarded to Rhonda Finogle;

(2) primary physical custody of Tyler Finogle shall continue to be with Brian and Aleene Short;

(3) Rhonda Finogle and Robert Finogle shall also have physical custody of Tyler Finogle as follows:

(a) beginning on the Thursday evening preceding Good Friday through Easter Sunday;

(b) throughout the three day Memorial Day weekend;

(c) for one week beginning June 14, 1997;

(d) from the evening of July 3, 1997, to Sunday, July 7, 1997;

(e) for 10 days beginning July 26, 1997;

(f) for two weeks beginning August 23, 1997;

(g) such further physical custody as may be ordered by the court following a review conference which is hereby scheduled for August 27, 1997, at    m.;

(5) Rhonda Finogle shall, during all times that she has physical custody of Tyler, abstain from the use of alcohol and, except by prescription, controlled substances;

(6) Brian and Aleene Short, Rhonda Finogle, Robert Finogle, and Christopher Williams shall engage in such joint and individual counseling as may be recommended by Charles Cornwall or his designee;

(7) the prothonotary shall cause a copy of this order to be delivered to Charles Cornwall, who shall either provide counseling to the above-named individuals or shall refer them to the appropriate counselor or counselors.