## DiGuardi v. Hine

C.P. of Berks County, no. 00-2486.

*Gregory D. Henry,* for plaintiff.
*Barbara H. Berm,* for defendant Hine.
Defendant *Anthony DiGuardi* failed to appear.

LASH, *J.,* May 13, 2010—The matter before this court is the petition of defendant, Patti Hine (Mother), to

modify the child custody order entered by this court on June 2, 2009 regarding custody of the Minor Child, Nathaniel DiGuardi, born September 10, 1999. A trial was held on May 7, 2010. We enter the following findings of fact:

## I. FINDINGS OF FACT

(1) Plaintiff, Lorrie A. DiGuardi (Grandmother), is an adult individual who currently resides at 762 North 6th Street, Reading, Berks County, Pennsylvania 19601.

(2) Defendant, Patti Hine (Mother), is an adult individual who currently resides at 1111 Green Street, Reading, Berks County, Pennsylvania 19604. Mother has resided at her current residence since October 2009. Previously, she resided at 145 South 12th street, Reading, Berks County, Pennsylvania 19602.

(3) Defendant, Anthony E. DiGuardi (Father), is an adult individual who currently resides at 762 North 6th Street, Reading, Berks County, Pennsylvania 19601.

(4) Mother and Father are the natural parents of a minor child, Nathaniel DiGuardi, born September 10, 1999.

(5) Grandmother is the paternal grandmother of the minor child.

(6) Mother is the natural parent of two other children, Jeremy Kiwak, age 6, and Jocelyn Hine, age 4. Jeremy resides with his father. Jocelyn currently resides with caretakers, Stacey and Larry Wells, however, after trial held, this court by order of January 14, 2010 transferred primary custody of Jocelyn to Mother to take effect on

August 1, 2010, with the Wells' to have partial custody one weekend per month. The decision and order entered by this court on January 14, 2010 to docket no. 08-1536 in the Court of Common Pleas of Berks County, Pennsylvania, is made a part of this record and incorporated by reference.

(7) Father has two other children, who reside with their natural mother.

(8) This court held a child custody trial on the above-captioned matter on May 26, 2009. At that time, the court made specific findings of fact and ordered, among other things, that Grandmother would have primary physical custody of the minor child, with Mother to have partial custody on alternate weekends from Friday at 5 p.m. to Sunday at 5 p.m. and one evening per week, the day to be determined by agreement, but in lieu thereof, Wednesday evening from 5 p.m. to 8 p.m. The decision and order of this court entered June 2, 2009 is made a part of this record and incorporated by reference.

(9) The minor child is currently in fourth grade at Cabrini Academy, a parochial school in the City of Reading. Grandmother pays the tuition. However, Cabrini Academy is downsizing and will not be offering fifth grade classes for the 2010-2011 school year. Accordingly, Grandmother's plan is to enroll the minor child at St. Margaret's Elementary School, also a parochial school, whose tuition will be paid by Grandmother.

(10) Mother's plan is to obtain primary custody and enroll the minor child at 10th and Green Elementary school, a public school in the Reading School District.

## II. DISCUSSION

In making a determination, this court considered the testimony of Mother, Grandmother, Mother's therapist, Connie Malafarina, Father's sister, Jamie DiGuardi, Father's ex-girlfriend and Mother of his children, Lisa Erb, Mother's Brother, Christopher Reichart, an in camera conference with the minor child, the exhibits submitted by the parties, and the decision and order entered by this court in the within matter on June 2, 2009, and in the matter of *Patricia Hine v. Larry Wells, Stacey Wells and Quillen Thrasher,* entered January 14, 2010.

Mother's separation from the minor child began on July 31, 2007 when the minor child was removed from her by Berks County Children & Youth Services (CYS) primarily due to her relationship with Quillen Thrasher, the father of her daughter, Jocelyn, who was convicted of recklessly endangering the welfare of a child. Mr. Thrasher had been accused of excessively shaking an infant child. Additionally, CYS was concerned with issues relating to mother's instability, her mental health, and her involvement with drugs and alcohol.

Since July 31, 2007, Grandmother has had custody of the minor child. She, with the assistance of her daughter, Jamie DiGuardi, has provided for all the caretaking responsibilities required by the minor child. The minor child has an established and stable home environment. The minor child's school activities are monitored, and the minor child is required to complete his homework assignments as soon as he is home from school. The minor child is active in several sports, namely, baseball,

football and basketball, with Grandmother or Jamie DiGuardi making sure that the minor child is at every practice and game. Grandmother also foots the bills for the activities.

The minor child has contact with his Father, as Father also resides in Grandmother's household. Father engages in recreational activities with the minor child. The minor child also has a playmate, his cousin, Jose, Jamie DiGuardi's son, who resides in the house.

Since July 31, 2007, Mother has accepted the directions of CYS and the court and has participated in therapy and classes, as more fully set forth in our opinion of June 2, 2009, sufficient to prepare her to reassume the role of a caretaker. Mother sets forth that she is now ready to assume this responsibility and requests that the court award her primary custody.

Mother generally has the minor child on alternate weekends, at the same time she has her other children. She states that the minor children get along well together. She has bedrooms for the children, however, the children prefer to sleep in Mother's bedroom, in their own beds, because they are scared to sleep alone. Mother believes her home presents an appropriate environment. In addition to ample space within the home, she has a yard for the children. The home is within two blocks of 13th and Green Elementary School, where the minor child would attend.

Mother does not drive, preferring to walk, take a bus, or rely on others to provide her transportation. This could cause some concern regarding transporting the minor child to his sports activities. Mother states that she has

been in contact with other mothers participating in the sports who have agreed to help out. Mother states that she would not use her transportation issues as the basis for denying the minor child access to sports activities, although she does question how committed he is to some of the sports.

Grandmother's position is that the status quo should be maintained. She has provided a stable home for the minor child, since being called upon by CYS in July 2007. The minor child's father resides with her, as does the minor child's aunt, Jamie DiGuardi, and cousin, Jose Malave, all of whom have a good bond with the minor child and spend time with him. Jamie DiGuardi is very involved in helping the minor child with homework and transporting the minor child to the sports activities. Jamie also assists Grandmother in the day-to-day maintenance, in part because of Grandmother's work schedule, working third shift, getting her sleep in the morning and mid-day hours.

In essence, Grandmother believes that she has provided a stable household and does not see why any change should be made. She is concerned about Mother's ability to care for the minor child and to provide him with his basic needs. She is also concerned about Mother's ability to transport the minor child to the sports activities. She also observed that, due to transportation or for some other reason, Mother has not always followed through with her scheduled visits.

Both parties relate difficulty in getting along with the other party. Mother portrays Grandmother as possessive and controlling. According to Mother, Grandmother does

not provide her with the sports schedule, or any information, and in fact refuses to speak with her at all. Mother states that Grandmother has made it difficult for Mother to see the minor child on weeknights, switching the days from Wednesdays to Mondays, which is a bad day for Mother because of her therapy and class sessions being scheduled at that time. For her part, Grandmother states that Mother does not appear sufficiently invested, failing to appear for certain visits, and being very difficult. According to Grandmother, any discussions with Mother quickly turn into an argument. From this court's perspective, both parties appear to share somewhat in the blame. It is likely that Grandmother can be controlling and condescending to mother. Mother has insecurities which present as a "chip on her shoulder," making it difficult for her to accept any direction from Grandmother, whether fair or unfair.

The law is well established. As we stated in our prior opinion, the paramount concern in a child custody proceeding is the best interests of the child. *Costello v. Costello,* 446 Pa. Super. 371, 375, 666 A.2d 1096, 1098 (1995). A determination of what is in the best interests of a child is made on a case-by-case basis and must be premised upon consideration of all factors which legitimately have an effect upon a child's physical, intellectual, moral and spiritual well-being. *Alfred v. Braxton,* 442 Pa. Super. 381, 385, 659 A.2d 1040, 1042 (1995).

That being said, we also recognize Grandmother's added burden as a third party. "[W]here the custody dispute is between a biological parent and a third party, the burden of proof is not evenly balanced. In such in-

stances, 'the parents have a "prima facie right to custody," which will be forfeited only if "convincing reasons" appear that the child's best interests will be served by an award to the third party. Thus, even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the [biological] parents' side.'" *Jones v. Jones,* 884 A.2d 915, 917 (Pa. Super. 2005), quoting *In re Hernandez,* 249 Pa. Super. 274, 376 A.2d 648, 654 (Pa. Super. 1977). [Emphasis omitted.]

When this matter was last before the court, Mother had been involved in the process of developing into a responsible parent, with the help of her therapists and instructors. At that time, she was not prepared to assume primary custody. Since the trial, the process has continued. As she moves further away from the issues of her past, she appears to be more confident and assured of her capacity as a parent. She states she is now ready to assume custody.

Grandmother has provided an appropriate household for the minor child to reside for the better part of three years. She was willing to step in when called upon, and she remains willing and able to fulfill the responsibilities of a parent. In 2009, this court awarded Grandmother primary custody and would be prepared to do so again, at this juncture, if Mother were not ready to assume her role as a parent. However, as a third party, Grandmother's status as caretaker is subordinated to Mother's status if she can properly perform as a parent.

Mother has complied with the terms and conditions set by the court. There is no evidence that she has any relationship with Quillen Thrasher at this time. Her per-

sonal issues have been addressed. The reasons that existed when CYS stepped in to assume temporary custody are no longer present. While there are potentially still problems, particularly logistical involving transportation that may still exist, these are not reasons to deny a parent full custody status. Further, the timing is appropriate, as the minor child is completing his school year and will have to switch schools under any circumstances for the 2010-2011 school year.

This court shall award primary custody to Mother, with Grandmother to have partial custody every other weekend to take effect one week after the end of the minor child's school year. Mother requested that Grandmother have supervised visits, stemming primarily from the hard feelings between the two, but that request simply is not appropriate. Further, Father resides in the household, and although he has not stepped forward to assume a parenting role, he, nevertheless, should have interaction with the minor child, which can be accomplished at Grandmother's house on the alternating weekend basis. Additionally, Grandmother will receive one evening per week, with the date to be Wednesdays, if the parties cannot agree on another date.

We enter the following order:

## ORDER

And now, May 13, 2010, after trial held, custody of the minor child, Nathaniel DiGuardi, born September 10, 1999, shall remain as set forth in this court's order of June 2, 2009, until one week after the conclusion of

the minor child's 2009-2010 school year. At that time, custody shall be transferred as follows:

(1) Defendant, Patti Hine (Mother), shall have sole legal custody of the minor child.

(2) Mother shall have primary physical custody of the minor child.

(3) Plaintiff, Lorrie A. DiGuardi (Grandmother), shall have partial custody of the minor child on alternate weekends from Friday at 5 p.m. to Sunday at 5 p.m., and one evening per week, the day to be determined by agreement, but in lieu thereof, Wednesday evening from 5 p.m. to 8 p.m.

(4) Mother shall have Mother's Day with the minor child each year from 9 a.m. to 8 p.m. As Grandmother and defendant, Anthony E. DiGuardi, reside together, Grandmother shall receive Father's Day each year from 9 a.m. to 8 p.m.

(5) The parties shall alternate the following named holidays, with Mother having the next holiday after the date of this order from 9 a.m. to 8 p.m.: Easter, Memorial Day, July 4th, Labor Day, and Thanksgiving.

(6) Grandmother and Mother shall alternate the Christmas holiday, such that on odd-numbered years Mother shall have custody from December 24 at 1 p.m. through December 25 at 1 p.m., then Grandmother shall have December 25 at 1 p.m. to December 26 at 1 p.m., with the parties to alternate the schedule on even-numbered years.

(7) The holiday schedule shall take precedence over the regular custody schedule.

(8) Quillan Thrasher shall have no contact with the minor child whatsoever.

(9) Mother shall continue with counseling as recommended and shall continue on medication as prescribed.

(10) The attached appendix shall be made a part of the within order.

## APPENDIX

Certain rules of conduct which generally apply to custody matters are set forth below and are binding on both parties, the breach of which could become the subject of contempt proceedings before this court, or could constitute grounds for modification of this order. If these general rules conflict with any specific provisions of the order, the order shall prevail.

(1) In addition to the foregoing rights, both parties shall also have the following rights with respect to the child:

(A) The right to reasonable telephone contact with the child when he or she is in the other parent's custody.

(B) The right to be fully informed concerning the progress of the child in school and the child's medical status, including the right to obtain the necessary information directly from the child's school or medical practitioner; and

(C) The right to be informed in advance before any important decisions are made concerning the child and the opportunity to participate in those decisions.

(2) In the event of any serious illness of the child at any time, any party then having custody of the child shall immediately communicate with the other party by telephone or by any other means, informing the other party as to the nature of such illness, and during such illness, each party shall have the right to visit the child as he or she desires consistent with the proper medical care of the child.

(3) Neither party shall alienate nor permit to attempt to alienate the child from the other party. While in the presence of the child, neither parent shall make any remarks or do anything which is derogatory or uncomplimentary to the other and it shall be the duty of each parent to uphold the other parent as one the child should respect and love.

(4) Both parties shall provide each other with their addresses and telephone numbers of their residences and anytime they take a trip with the child out of the jurisdiction of Berks County in excess of three days.

(5) The parties shall not conduct arguments or heated conversation when they are together in the presence of their child.

(6) The parties shall, at all times, consider the child's best interests, and act accordingly. It is in a child's best interest to understand that he or she is trying to desperately cope with the fact of his or her parents' separation, and needs help in loving both parents, rather than interference or censure.

(7) Neither party shall question the child as to the personal lives of the other parent except insofar as necessary to insure the personal safety of the child. By this we

mean that the child will not be used as a spy on the other party. It is harmful to a child to be put in the role of spy.

(8) The parties should remember that they cannot teach their child proper moral conduct by indulging in improper conduct themselves. Children are quick to recognize hypocrisy, and the parent who maintains a double standard will lose the respect of his or her child.

(9) Weekend and evening visitation shall be subject to:

(A) Arrangements will be worked out beforehand between the parties without forcing the child to make choices and run the risk of parental displeasure. However, the child shall be consulted as to his or her schedule when appropriate.

(B) Visitation rights shall be exercised at reasonable hours and under circumstances reasonably acceptable to the other party and to the need and desire of the minor child.

(C) If a party finds himself or herself unable to keep an appointment, he or she should give immediate notice to the other party, so as to avoid subjecting the child to unnecessary apprehension and failure of expectations.

(D) The party having custody of the child should prepare him or her both physically and mentally for the transfer of custody to the other party and have him or her available at the time and place mutually agreed upon.

(E) If either party or a child has plans which conflict with a scheduled visit and wish to change such visitation,

the parties should make arrangements for an adjustment acceptable to the schedules of everyone involved. Pre-determined schedules are not written in stone, and both parties should be flexible for the sake of the child.

(F) If a party shows up for a visit under the influence of alcohol or drugs, the visit may be considered forfeited on those grounds alone.

(10) If either party feels the other party has violated this order, they may petition the court as set forth in Pa.R.C.P. 1915.12.